Argued April 27, 1955, reversed March 14, 1956

# STATE TAX COMMISSION *v.* CONSUMERS' HEATING CO.

294 P. 2d 887

*Alfred B. Thomas,* Assistant Attorney General, argued the cause for appellant. With him on the briefs were Robert Y. Thornton, Attorney General, and Theodore W. de Looze, Assistant Attorney General, all of Salem.

*R. B. Maxwell* argued the cause for respondent. On the briefs were Farrens & Maxwell, Klamath Falls.

Before WARNER, Chief Justice, and TOOZE, ROSSMAN, LUSK, LATOURETTE and PERRY, Justices.

ROSSMAN, J.

This is an appeal by the State Tax Commission from a decree of the circuit court which set aside an order entered by the commission. The order found that for the purpose of the levy of ad valorem taxes

the property of the respondent, Consumers' Heating Company, had a "true cash value" of $240,000 January 1, 1952. The respondent renders steam heating service in the business district of Klamath Falls and as such is a utility within the purview of ORS 306.505 to 308.660. The term "true cash value" employed in the preceding sentence was taken from ORS 308.540, which says:

"The State Tax Commission shall prepare each year an assessment roll, in which shall be assessed, as of January 1 at 1:00 a. m. of each year, the true cash value of all the properties of the several companies subject to taxation under ORS 308.505 to 308.660."

All of the property of the respondent which the commission assessed is in Klamath county and is employed by the respondent in the performance of its public utility service. After the commission had made its assessment, the respondent availed itself of the privilege granted by ORS 308.620 and appealed to the circuit court. That court, after trial, entered the decree which is challenged by this appeal. The decree set aside the order of the commission and in its stead substituted as the true cash value of the property $137,000. We will hereafter speak of the appellant, State Tax Commission, as the tax commission and of the respondent as the company or the taxpayer.

The public utility service which the taxpayer performs consists of generating and supplying steam heat to buildings in the central part of Klamath Falls. At the time of the trial it had 251 customers. Its property includes several lots which are situated near the business district of Klamath Falls and upon which its generating plant is located. The plant was originally constructed in 1919, but about 1929 was rebuilt. Form-

ing a part of the plant are structures which house boilers and other generating apparatus. Another important part of the plant, the distribution system, consists of several miles of underground pipe through which steam is conducted to the buildings of the customers. Some of the pipe is 12 inches in diameter. The mains are provided with adjunct facilities such as manholes, reducers and return pipe. Leading from the mains to the buildings of the customers the company has installed conduits which are called service pipes. They are equipped with meters and reducing valves.

The concern which built, and for about ten years operated, the plant was entitled the Klamath Heating Company. In 1928 it sold the business to Pacific Bank Corporation and two years later the property was acquired by Columbia Utilities Company. The latter operated this plant and another public utility until 1946. In the five-year period immediately preceding 1946 the Columbia Utilities Company suffered annually losses in the operation of the plant ranging from $3958.67 to $15,130.46. Sometime prior to 1946 the Columbia Utilities Company decided to dispose of the plant and made unsuccessful efforts to find a buyer. By 1946 it had concluded to shut down operations and dismantle the plant if a buyer did not appear.

The heating plant burns hogfuel which is less expensive than oil or gas. Hogfuel consists of sawmill refuse. Some of the buildings served by the company were equipped with heating plants but they remained idle because the company could supply heat cheaper than the building's equipment could furnish it.

When the customers who were supplied with heat by the Columbia Utilities Company faced the threat of having their service discontinued, they became inter-

ested in the organization of a corporation which would purchase the plant and continue its operation. Unless the plant could be continued in service, the customers would have to obtain their heat elsewhere.

In 1946 the Consumers' Heating Company was organized. It had 160 stockholders, substantially all of whom were customers of the existing plant. Those 160 persons gave $148,400 for their stock (2968 shares at $50 per share). Since no commission was paid to anyone for selling stock, the sum just mentioned was net to the new company. A leader in the organization of the new company was Mr. G. C. Lorenz, a substantial businessman of Klamath county who was a customer of the plant. Mr. Lorenz had been an officer of the Klamath Heating Company when the latter built the facility and was elected president of the new company. The latter purchased the property in August of 1946 at a price of $53,344.70. According to Mr. Lorenz, the plant was in a bad state of repair when the purchase was made. The new company actually paid more than $53,344.70, for, in addition to that sum, it paid $16,-186.55 for materials and supplies which consisted largely of fuel. The materials and supplies were subject to ad valorem taxation.

From the day the present company acquired the plant to January 1, 1952 (when the contested assessment was made), the company spent $179,058.30 in making improvements upon it. One of the improvements was the addition of another boiler which, with appurtenant appliances, cost $90,000. The work of installing the boiler was completed in 1950.

The money which paid for the extensive improvements was procured from bank loans, a small bond issue and the proceeds from the sale of stock. At the time of the trial all of the indebtedness had been dis-

charged with the exception of $20,000 which was owing upon a bank loan.

The issue of true cash value does not concern the year 1946, when the plant was purchased, but January 1, 1952, when the challenged assessment was made. In the year 1946 the company's operating income (gross income less all expenditures except interest) was represented by a red figure of $11,829.52. Red figures, varying in amount from $3,958.67 to $15,130.46, denoted the results of operation from 1942 through 1946, but in 1947, after Mr. Lorenz had taken charge, operating income was represented by a black figure of $11,-593.62. Each year since 1946 has been successful. Operating income beginning with 1947 has been as follows:

| | |
|------|------------|
| 1947 | $11,593.62 |
| 1948 | 25,241.59 |
| 1949 | 16,250.49 |
| 1950 | 22,893.62 |
| 1951 | 11,120.72 |

Mr. Lorenz has received no remuneration for his services. Until the installation of the new boiler was completed in 1950 he devoted "I would say 75 to 80 per cent of my time" to the company. Since then, especially after the company's manager had become familiar with the plant, Mr. Lorenz has given less time to the company. The latter, in the period represented by the above figures, made use of Mr. Lorenz' office and paid him therefor $200 per month. The secretary is allowed $50 per month for his services. The treasurer, vice-president and the members of the board of directors are unpaid. Mr. Lorenz estimated that in the period when he gave freely of his time to the company his services were worth $7,500 to $10,000

annually. At the time of the trial he still was paid nothing for the services which he continued to render.

The company has paid no dividends to its stockholders, but in 1951 it transferred $10,399.77 to its surplus account. The amount transferred in 1950 was $21,824.52. It will be noticed that it improved the plant to the extent of $179,058.30 and that it has discharged all of the resulting indebtedness with the exception of $20,000. Thus, in 1946 it had a plant for which it paid $53,344.70 and outstanding stock of a par value of $148,400. It now has a plant costing $53,344.70 but amplified by improvements which cost it $179,058.30. The following figures contrast the situation of 1946, when the plant was purchased, with that of January 1, 1952, when the challenged assessment was made:

|  | 1946 |  |
|---|---|---|
| Cost of plant |  | $ 53,344.70 |
| Oustanding stock |  | 148,400.00 |
| Operating loss |  | 11,829.52 |
|  | 1951 |  |
| Cost of plant |  | $ 53,344.70 |
| Improvements |  | 179,058.30 |
|  |  | $232,403.00 |
| Bank indebtedness |  | 20,000.00 |
|  |  | $212,403.00 |
| Outstanding stock |  | 148,400.00 |
| Operating gain |  | 11,120.72 |

Mr. Lorenz testified that the report which the utility made to the tax commission for the year beginning December 31, 1951, showed that the book value of the property was $470,700.56, and also that at that time construction work was in progress costing $5,458.91.

The company contends that the transaction whereby it acquired the plant at a price of $53,344.70 was conducted at arm's length and was of a voluntary character. It argues that the price which it paid reflects the true cash value of the property. The commission insists that neither buyer nor seller were willing participants in the transaction and that each was driven into it by necessity. It urges that the sum paid for the property does not reveal true cash value.

The only direct testimony which indicates whether or not the 1946 transaction was of the kind which causes the price paid to mirror true cash value was given by Mr. Lorenz. We take the following excerpts from his testimony:

"Well, a bunch of business men in Klamath Falls were just simply forced into doing something to get themselves some heat. And it was after the World War II and it was a little hard to get equipment at that time, and it was getting towards the fall of the year, into August, and they were just practically forced to purchase it in self defense, so to speak, not because they wanted it by any means. None of us ever wanted to buy it."

"Nobody put in for an investment, they bought it for service."

"Well, it was done, not because they wanted to buy the plant, it was done because they wanted to get heat."

In 1947 the book value (total cost less depreciation of the property) was $224,577.17. As we have pointed out, the crucial day is January 1, 1952, and the problem which must be resolved is: What was the "true cash value" of the property of the company on that day. We have mentioned the fact that the tax commission determined that the true cash value of the property was $240,000 January 1, 1952. In its petition to the

circuit court for an appeal, the company prayed that the valuation be fixed at "not exceeding $170,000." The challenged decree of the court found the true cash value to be $137,000.

Before going on it will be useful to engage in calculations which will help to identify figures, although they may not yield dependable indices of value:

1.

| | |
|---|---|
| Sum paid by the company for the property | $ 53,344.70 |
| Additional amount the company paid for materials and supplies | 16,186.55 |
| Expenditures made by the company for improvements since its purchase of the plant | 179,058.30 |
| | $248,589.55 |

2.

| | |
|---|---|
| Book value (historical cost less depreciation) of the plant in 1946 when Columbia Utilities Company sold | 224,577.41 |
| Amount spent upon improvements since the Company acquired the property | 179,058.30 |
| | $403,635.71 |

If the amount of $53,344.70, which is the first figure used in the first compilation, is less than the true cash value of the property, then the last figure in that compilation ($248,589.55) is too small. Both of the above sums, $248,589.55 and $403,635.71, will, of course, have to be reduced by depreciation deductions. At the time of the contested assessment and for some years prior thereto the company had made an annual depreciation deduction of $7,932. The figure had been approved by the public utilities commissioner and its use by the company had met with the acquiescence of the tax

commission. September 25, 1952, the public utilities commissioner prescribed for the company a different depreciation rate. The deduction of $7,932 was authorized when the company employed as its base the historical cost of the plant which, in 1946, was $315,846. Accordingly, we assume that a sum less than $7,932 would be appropriate if we start with $53,344.70. However, the depreciation deduction of $7,932 apparently would be proper with the book value of 1946—$224,577.41. When we multiply $7,932 by five, being the number of elapsed years, we have $39,660. Deducting that amount from $403,635.71 gives us $363,975.71, representing the depreciated value of the property January 1, 1952, if our other figures are accurate. We realize the deficiencies of these calculations as methods of determining true cash value and repeat that we have resorted to them for the purpose of identifying the data which we will have occasion to mention from time to time as we proceed.

The company's auditor prepared for the circuit court two compilations which he thought revealed true cash value. We will now given attention to them. His first compilation follows:

| | | |
|---|---:|---:|
| Total utility plant | | $472,237.82 |
| Deduct: | | |
| Transportation equipment (licensed by Secretary of State) | $ 16,784.50 | |
| Other deductions: | | |
| Organization expenses | 2,393.68 | |
| Franchise and consent | 125.00 | |
| Reserve for depreciation | 153,931.87 | |
| Acquistion adjustment | 124,305.38 | |
| Total deductions | | 297,540.43 |
| Total (assessable) operating property | | $174,697.39 |

The following is the auditor's second compilation:

Utility plant:

| | | | |
|---|---|---|---|
| Original cost | | $ 53,344.70 | |
| Acquisition, years 1946–1951 | | 179,058.30 | |
| Total utility plant | | | $232,403.00 |
| Deduct: | | | |
| Transportation equipment, allocated portion of original cost | $ 1,586.77 | | |
| Transportation equipment acquired, years 1946-1951 | 7,517.35 | $ 9,104.12 | |
| Organization expense | | 2,393.68 | |
| Franchise and consent | | 125.00 | |
| Reserve for depreciation, adjusted | 87,459.03 | | |
| Less allowable to transportation | 18,592.27 | 68,866.76 | |
| Total deductions | | | $ 80,489.56 |
| Total (assessable) operating property, adjusted | | | $153,913.44 |

In order to facilitate an understanding of the auditor's calculations we make the following explanations. By the term "total utility plant" he meant the total amount of money expended in creating the plant since the day construction was begun in 1919. The total was $472,237.82. A part of the expenditures were annually returned to the company through the depreciation deduction which we have mentioned—$7,932. By January 1, 1952, the total depreciation reserve (as shown in the auditor's compilation) was $153,931.87. By returning to the first of the auditor's tables it will be noticed that under the heading of "Deduct" he subtracted the value of the transportation equipment (motor vehicles) which the company owned January 1, 1952. The deduction was made because an ad valorem tax is not assessable upon motor vehicles. Next, the

auditor's table mentions two items, the first of which is entitled "Organization Expenses" and the second "Franchise and Consent." The tax commission does not concede that the sums representing the value of those parts are deductible. We are satisfied that they are not deductible if the company's purchase acquired for it those two parts of the property. The evidence indicates that those items were a part of the purchase and, therefore, constituted parts of the property which were transferred to the company. Accordingly, their value was not deductible by the auditor. The entry, "Acquisition Adjustment" in the amount of $124,305.38 is, seemingly, the vital one in the auditor's compilation. That sum came from figures compiled by the public utilities commissioner and appears to be the fulcrum of this case. We shall now explain how the commissioner reached the figure ($124,305.38). As we have said, the commissioner, until September 25, 1952, permitted the company and its predecessors to employ an annual depreciation rate of $7,932. By January 1, 1952, the total accumulated under the rate was $153,931.87, but that sum failed by a margin of $124,305.38 to depreciate the property down to $53,344.70, the amount which the company paid for the property in August, 1946. Accordingly, the public utilities commissioner authorized the company to employ, for the purpose of determining value in rate-making, the aforementioned Acquisition Adjustment of $124,305.38. In determining true cash value the correctness of the sum of $124,305.38 is dependent upon whether or not the property's "true cash value" on January 1, 1952, was $53,344.70. If the true cash value on January 1, 1952, was substantially more than $53,344.70, the acquisition adjustment was too large. Therefore, before one can accept $174,697.39 as the true cash value of

the property on January 1, 1952, he will have to determine the propriety of the acquisition adjustment and also its amount.

We now turn to the second table prepared by the company's auditor. It will be observed that while the first set of figures starts with historical cost ($472,-237.82) the second set begins with the amount which the company paid for the property in 1946 ($53,344.70). The table accepts that sum for the purposes of this company as its historical cost. Thus, it makes the history of this plant begin with 1946, and not with the year when the plant was built. It disregards all historical cost prior to 1946 and accepts as "true cash value" the sum of $53,344.70. If the sum just mentioned and true cash value are not synonymous, then the very beginning of the calculation is in error. In analyzing the first of the auditor's calculations, we took note of the other elements in the second calculation down to the point of "reserve for depreciation, adjusted." The latter is $87,459.03. Since the auditor entered as the total value of the plant only $232,403, a depreciation deduction of $87,459.03, accumulated in five years or less, seems rather large, especially since a large part of the $179,058.30, which enters into the total depreciable sum of $232,403, was invested in the plant only a short time before the depreciation period began. The testimony of the tax commission's appraisal engineer, which is the only explanation the record affords, shows that the deduction of $87,459.03 was not based upon a historical cost of $232,403, but upon some larger figure. When the auditor made his calculation he failed to include as parts of the physical plant the amount of fuel on hand January 1, 1952. Its amount was $11,000. We have mentioned other items such as "organization expense" and "franchise and

consent" which should not have been deducted. Accordingly, when the adjustments that we have indicated are made, the net values revealed by the auditor's tables will be augmented, but we think that the vital figure is $53,344.70. If it is accepted as the "true cash value" of the property on January 1, 1952, the auditor's figures may be correct, but if that sum is not synonymous with true cash value, the figures are in error.

We shall now return to the transcript and detail other facts and data which tend to disclose the true cash value of the property on January 1, 1952.

For the years 1939 through 1945 the tax commission, pursuant to statutes which are now ORS 308.540, had determined the true cash value of the company's assets at sums varying from $105,000 to $128,000. In 1946 it deemed that the true cash value was $110,000. On January 1, 1947, the first assessment date after the company had made its purchase, the true cash value was set by the tax commission at $100,000 and remained there the next year. In 1949 the amount was increased to $130,000. By that time the operation of the plant had recovered from the red figures which had represented operating income and had had three years of successful operation represented by black figures in the following amounts: $11,593.62, $25,241.59 and $16,250.49. In 1950, after a year which produced an operating income of $22,893.62, the property was assessed as worth $200,000. In 1951, after operating income had become $11,120.72, the figure reached $240,000. And in 1952 the tax commission deemed that the true cash value was $245,000 but, upon review, reduced the sum to $240,000. The order fixing the amount at $240,000 was the one which was challenged upon appeal to the circuit court. As we have said, the

petition to the court for an appeal asked that the amount be set at a figure "not exceeding $170,000." The court chose as the amount representing true cash value $137,000.

For the present the above will suffice as a delineation of the facts.

ORS 308.540 directs the tax commission to prepare each year an assessment roll in which shall appear the "true cash value" of all the properties of utility companies subject to taxation. ORS 308.545 provides:

"For the purpose of arriving at the amount and character and true cash value of the property belonging to a company, the commission personally may inspect the property, and may take into consideration the statements filed under ORS 308.505 to 308.660, the reports, statements or returns of the company filed in the office of any board, office or commission of this state, or any county thereof, the earning power of the company, the franchises and special franchises owned or used by the company, and such other evidence of any kind that is obtainable bearing thereon. However, no report, statement or return shall be conclusive upon the commission in arriving at the amount and character and true cash value of the property belonging to the company."

We have mentioned the statutes which authorize appeal to the circuit court. ORS 308.630 reads:

"The appeal shall be heard and determined by the circuit court in a summary manner and shall be determined as a suit in equity, except as otherwise provided in this section. * * * If, upon the hearing, the court finds the amount at which the property was finally assessed by the commission is its true cash value and that the assessment and apportionments to the State of Oregon and among the several counties were made fairly and in good

faith, it shall approve the assessment; but if the court finds that the assessment was made at a greater or less sum than the actual true cash value of the property, or if the assessment or apportionments were not fairly or in good faith made, it shall set aside the assessment and determine the actual true cash value    *    *    *.''

"True cash value" is defined by ORS 308.205 as "the amount the property would sell for at a voluntary sale made in the ordinary course of business, under normal conditions". When this proceeding arose, the phrase just mentioned was amplified (§ 110-335 OCLA) with these qualifying words: "taking into consideration its earning power and usefulness under normal conditions."

■ The procedure for review in the circuit court is a special statutory proceeding. *Smith Securities Co. v. Multnomah County,* 98 Or 418, 192 P 654, 194 P 428. ORS 19.010(4) says:

"An appeal may be taken from the circuit court to the Supreme Court in any special statutory proceeding under the same conditions, in the same manner and with like affect as from a judgment, decree or order entered in an action or suit, unless such appeal is expressly prohibited by the law authorizing such special statutory proceeding."

ORS 308.630, which defines the special statutory proceeding, directs that appeals to the circuit court "shall be heard as a suit in equity." ORS 19.120 provides:
        "*    *    *    Upon an appeal from a decree given in any court the suit shall be tried anew upon the transcript and evidence accompanying it."

■ The tax commission suggests that the provisions of ORS 308.545, and not the definition of "true cash value," given in ORS 308.205 applies when the com-

mission assesses utility property. We do not agree. The quoted term is used in many places in the statutes, but only in the latter section is it defined. The definition appears to apply generally. Nonetheless it is evident that the definition envisages as the subject of its most frequent application property which commonly enters the real estate market. Utility property is not generally of that kind. Therefore, the lawmakers prescribed in ORS 308.545 additional factors which may be considered in arriving at "the amount such property would sell for at a voluntary sale made in the ordinary course of business." We shall have occasion again in this decision to refer to the definition of "true cash value" and the means by which it may be determined. It should be noted that the definition does not provide that the assessing agency is bound by the price paid in any particular sale.

■ The taxpayer presents an issue of broader import. It argues that when this court entertains appeals from assessment orders entered by the circuit court it is concerned only with rulings on the admission of evidence and the application of rules of law. We think that the company does not entertain a proper conception of the function of this court in appeals of this nature. A reading of the statutes outlined above establishes that this court is concerned with the merits of the case when it retries (on the record below) an equity case. Until 1927 no appeal was allowed to this court in special statutory proceedings, but in that year the statute which is now ORS 19.010(4) was enacted permitting such appeals. In cases like *Weyerhaeuser Land Co. v. Board of Equalization*, 85 Or 434, 165 P 1164 (decided prior to the legislation of 1927) where the jurisdictional question was not raised, this court determined the merits of an assessment. Nothing in

*Smith Securities Co. v. Multnomah County,* supra, overrules the substantive law stated in the Weyerhaeuser decision. The company relies on the following language employed by Justice Brown in a concurring opinion in the Smith case:

> "Believing that this court is not authorized to act as a board of assessors in the matter of the valuation of property for the purpose of taxation, I concur in the conclusion reached by Mr. Justice Johns."

That language does not mean, as respondent interprets it, that this court can never review the merits of an assessment, for a reading of the opinion discloses that the court found that our legislature had adopted no legislation whatever which conferred upon the court jurisdiction to hear appeals in assessment matters. The 1927 legislation, as we have seen, changed that situation, although it did not prescribe the details of what this court should do in this type of appeal.

The Weyerhaeuser case was an appeal by a county board of equalization from the circuit court's action in adjusting assessments of timberland which allegedly were made at a greater than true cash value. The circuit court's action was taken under Oregon Laws 1913, ch 184, § 8, which, except for the use of the term "full cash value" is identical to ORS 308.630(1). This court, after reviewing the evidence presented by both the taxpayer and the board of equalization, found that the taxpayer had not successfully borne its burden of showing "that the assessment does not represent the fair value of the property." The assessment was approved. That case, as we have already pointed out, arose prior to 1927.

*Appeal of Kliks,* 158 Or 669, 76 P2d 974, was an appeal from a decree of the circuit court which had

sustained an assessment of an apartment house made by the State Tax Commission. By the time of the Kliks case legislation had made provision for appeal to this court from orders entered by the circuit court in assessment matters. Our decision held that the legislation did not contemplate that this court should step into the shoes of the assessor and take the course which he pursues when he makes assessments. To the contrary, it held that when this court reviews an assessment it engages in a presumption, in the absence of evidence to the contrary, that the assessor properly performed his duties in making the challenged assessment. The decision reviewed the evidence which both parties had presented and in so doing stated that its purpose in part was to determine whether the taxpayer had produced evidence which overcame the presumption that the assessor had properly performed his official duties. A major issue in that case was uniformity of assessment, but since the corresponding issue in this case does not concern us at this point we will not pause upon it now.

Section 69-507, OC 1930, which governed *Appeal of Kliks,* supra, said:

"Any of said parties, or the State Tax Commission, may appeal from a decision of the circuit court to the Supreme Court in the same manner as appeals are taken in suits in equity."

After the decision in the Kliks case the section just quoted was amended by Oregon Laws 1939, ch 490, § 6, through the addition of language almost identical with that in ORS 308.630(1). Then came *In re GeBauer Apartments,* 170 Or 47, 131 P2d 962, which held that the statute as amended presented upon appeal two questions: (1) Was the property assessed at a greater sum than its true cash value? and (2) Was the chal-

lenged assessment reasonably proportionate to the assessed value of similar property in the county? That decision said:

> "In instituting this proceeding the investment company assumed the burden of proving by clear and convincing evidence that the assessment of its property as of March 1, 1939, was in excess of its true cash value or that the assessment was not reasonably proportionate to assessed valuations of similar properties in Jackson county: *Weyerhaeuser Land Co.* v. *Board of Equalization,* 85 Or. 434, 165 P. 1164; *Appeal of Kliks,* supra, and authorities therein cited. In making the assessment much depends upon the judgment and discretion of the assessor. See cases last cited. In this instance the investment company has not overcome the presumption in favor of the correctness of the assessment."

█ The company, after calling attention to Oregon Constitution, Art I, § 32, which requires that "all taxation shall be uniform on the same class of subjects within the territorial limits of the authority levying the tax," argues in behalf of uniformity within the county. As was said in *Appeal of Kliks,* supra, relative uniformity is the basic requirement of property taxation. The party attacking an assessment bears the burden of rebutting the presumption that the assessor's appraisal complied with the requirement of uniformity. The tax commission introduced evidence showing that, as compared with all other utility property in the state, the property of this company was uniformly and favorably appraised. The company, however, says that statewide uniformity is not the primary requirement of the above section of our constitution and points to the fact that the taxes stemming from this appraisal will be levied by Klamath county. It introduced no evi-

dence indicating that, as compared with other property of the same class in Klamath county, the challenged appraisal was not uniform. The tax commission asserts that it performed the duty enacted by ORS 308.590(4) which follows:

"If it appears to the commission that the property in any county as assessed by the county assessor and equalized by the county board of equalization has been assessed at other than its true cash value, the commission shall change the apportionment of the property within that county assessable by the commission in a like proportion."

Pursuant to that statutory direction, the tax commission took the following course. It first appraised the value of the company's property and then determined that in Klamath county in 1952 the ratio of assessed value to true cash value was 36 per cent. Thereupon the commission reduced the company's assessment to 36 per cent of true cash value. The company presented no evidence that, as to relative uniformity, it was dealt with unfairly. We do not believe that the commission failed to comply fully with the demands of Oregon Constitution, Art I, § 32.

■ Having disposed of the above incidental issues, we return to the dominant one: Was the company's property appraised at a sum greater than its true cash value. The issue can be stated better in this way: Did the company sustain the burden which it assumed when it filed this proceeding by showing that its property was assessed at a sum greater than true cash value. It is necessary to take note of additional evidence which shows the manner in which the tax commission found the value of the company's property.

Mr. J. P. Manning, who joined the staff of the tax commission in 1937 and who was the commission's

chief evaluation engineer when the challenged assessment was made, described in detail the manner in which he made the evaluation. In giving his testimony, he employed a paper which he termed his work sheet. The latter accepted as its basic figures data which Mr. Manning obtained from the company's annual reports to the tax commission, particularly the one for the year ending December 31, 1951. Mr. Manning had performed or supervised all appraisals made of this company's property since 1939. The work sheet shows the 18 calculations which he made; they fall into three groups. The first is based on cost less depreciation. He took as cost for the year 1951 $463,609.02, which represents the total amount invested in the plant by all of the successive owners, and from that deducted depreciation reserves as reported by the company. He also made a calculation based on a 70 per cent "Equalization factor" which is used by the tax commission and which makes allowance for depreciation, obsolescence, franchise and going concern value. A third calculation in this group represented a breakdown on the amounts of depreciation allowable on costs of initial plant and subsequent additions.

In the second group the calculations were based on capitalization of operating income. "Operating income", as we have said, is gross income less expenses, taxes and depreciation, but not interest payments. Averages of operating income were struck for three, four and five-year periods so as to avoid the sharp variations in value which would otherwise be caused by fluctuations in annual income. *Appeal of Kliks,* supra. Capitalizations were figured at six per cent on the three, four and five-year averages. In his third group of calculations Mr. Manning took into consideration several factors. To the cost figure was applied

the equalization percentage and to that was added the cost of materials and supplies on hand and the capitalization of the average operating income for three years at six per cent. The result was divided by two to find the valuation. The second example is cost less depreciation, plus the value of materials and supplies on hand, plus the capitalized average operating income for three years at six per cent, which result was divided by two; a figure representing the commission's estimate of the value of intangibles and going-concern value was added to arrive at a valuation.

Mr. Manning's several calculations resulted in values ranging from $279,249 to $355,855. Their average was $321,575. The true cash value was found by the commission to be $240,000, unchanged from the previous year. In reply to a question why this figure was lower by nearly $40,000 than the lowest formula value, Mr. Manning answered:

"We took into consideration all factors. * * * And actually I believe that this company, in the condition it is, its historical background, its probable future prospects, should have additional consideration. These formula values would easily indicate that the property would be—should be assessed at something over $300,000, but taking into consideration the depressed condition of this company we have considered it to be worth no more than $245,-000. The commission, after further review, actually did arrive at $240,000.00."

Asked to elucidate further on the "condition of this company," he said:

"Well, the company was sold at a much less value than what it shows on its books. Their earnings have varied through the years. There is a possibility of running into fuel difficulties, although that could be overcome through conversion to oil

as has been done to other heating utilities in this State. Yet, by considering all of their own individual problems here we think that these formula values in this particular instance was high, and we therefore gave them other considerations and arrived at a much less value than indicated by the formulas.''

Mr. Manning's testimony is the only explanation afforded by the record as to the manner in which the valuation was reached.

■ Although Mr. Manning recognized that the market value of the securities issued by a utility as established by daily transactions in the open market affords a reliable indication of the value of the property of the utility, he expressed the belief that the few transactions which had occurred in the corporate stock of this company since it sold its original issue did not present a dependable index of the value of the company's property. As of January 1, 1952, there were outstanding in the hands of shareholders only 2968 shares. In the five-and-a-half-year period since the issue was marketed only a few transactions in the stock had occurred. The sales had yielded 50 and 60 per cent of par value ($50). We have taken notice of the fact that practically all of the stock was purchased in the first instance by the company's customers and that they bought it, not for investment purposes, but in order to assure themselves continued steam heat. The record affords no ground for believing that sales of corporate stock in an instance like the one before us supplies a reliable index to value of the corporation's assets. The evidence indicates that the occasional subscriber who sold his stock had special reasons for so doing; that is, he needed the proceeds or had ceased to be a customer of the plant. If the few sales that

have been made is an indicator of value, then even the low value placed upon the plant by the trial judge was much too high. We are satisfied that the few sales that took place yielded no basis for determining the value of the company's plant.

No reproduction cost study of the value of the company's property was made by the tax commission prior to the challenged assessment. The absence of such study was due assertedly to lack of sufficient staff and time. However, shortly before the trial Mr. Arthur R. von Lehe, an appraisal engineer for the commission, made an estimate in which he used the reproduction approach. According to him, he appraised the value of the plant "as though it were being reproduced under ideal conditions and in one unit." The appraisal was based upon a physical examination and the application of standard factors of value. From the reproduction figures Mr. von Lehe deducted depreciation on each major item which constituted a part of the plant. The resulting figure was $318,000, based upon a reproduction cost of $435,000.

The company's principal challenge to Mr. Manning's calculation of true cash value consists of a charge that he did not give proper effect to the depreciation factor in appraising the property. When the Klamath Heating Company owned the property it depreciated its facilities at the rate of $7,932 annually and that rate was assumed by the present company in setting up its books. At the beginning of 1946 the historical cost of the assets, that is, the number of dollars invested in the plant since the beginning of construction, was $315,846. The predecessor of the present company had entered upon its records cost of the plant, less depreciation, as $177,650.08. Then the plant was sold for $53,344.70. Due to the fact that

the annual depreciation rate of $7,932 had not brought cost, less depreciation reserve, down to $53,344.70, the public utilities commissioner allowed the "acquisition adjustment" of $124,305.38 which we have mentioned. In 1952 that official prescribed a new depreciation rate for the company and permitted its application retroactively to 1946. The new rate, variable in its nature, results in substantially increased depreciation accruals year by year.

■ In determining the true cash value of the company's property, Mr. Manning did not give effect to the acquisition adjustment or to the new depreciation rate which the public utilities commissioner had authorized the company to employ. The new depreciation rate had not been determined by the public utilities commissioner when the tax commission made its finding of true cash value. Mr. von Lehe, in making his reproduction cost study, likewise did not give effect to the new depreciation rate. The trial judge, in reaching his decision which reduced the true cash value, considered both the acquisition adjustment and the new depreciation rate. We shall not at this point decide the issue concerning the acquisition adjustment. Regarding the new depreciation rate, the issue is whether the tax commission was bound to consider it. The tax commission argues that it was not bound to do so. The company concedes that the tax commission was not bound by the public utilities commissioner's depreciation rate, but argues that the tax commission was required to consider that factor because the depreciation rate is pertinent to the price that would be paid for its property at a sale in the ordinary course of business, and, likewise, as to the net income which it will receive from the service it renders. It is difficult to understand how the commission could have con-

sidered the new depreciation rate because, as we have pointed out, that rate was not in existence when the tax commission made its finding as to the true cash value of the property. We cannot hold that the new rate was binding upon the tax commission, for while ORS 308.545 permits the consideration of the new depreciation rate, it goes on to say:

"* * * However, no report, statement or return shall be conclusive upon the commission in arriving at the amount and character and true cash value of the property belonging to the company."

Since the new depreciation rate established by the public utilities commissioner had been authorized before Mr. von Lehe made his reproduction cost study, Mr. von Lehe could have considered the new rate. However, he did not. In view of the fact that the circuit court rejected Mr. von Lehe's evaluation as "fantastic," we do not think that whether he should have given attention to the new rate is material. The trial judge considered the new rate but to what specific effect is not determinable by us. We cannot say that the tax commission should have considered the new rate because it was not in existence when that commission made its finding as to true cash value. Therefore, we are left with the question as to whether the company could depend upon the new rate as a part of its burden of overcoming the presumption in favor of the tax commission's assessment, and also as a basis for sustaining the circuit court's reduction of the amount of the assessment.

An understanding of the function played by depreciation in the performance of the duty assigned by statutes to the tax commission and the public utilities commissioner is essential. The primary function

of the public utilities commissioner is rate making and of the tax commission is assessment for taxation. Both functions require the evaluation of property. In rate making the aim is two-fold: (1) a fair return on invested capital and (2) protection of the capital itself. It is the latter that requires the use of a depreciation rate. Physical property in which capital is invested undergoes with time a natural decline, that is, a wasting away. Unless account is taken of that reality, the investor will be faced at the end of a period of time with the fact that, although he had a return on his investment, he has lost his capital. The depreciation reserve takes the place of property which has wasted away without having been restored. In taxation, value is sought so that the tax-levying body may determine the share of governmental costs which should be borne by any particular item of property. Here, again, the property undergoes a natural decline. Depreciation is the factor which reflects the declining value. See *State v. Southern Pacific Co.*, 95 Utah 84, 79 P2d 25.

Now, let us apply the distinction of which we have taken note to the facts at hand. The taxpayer before us became interested in 1946 in an item of property which represented a total dollar investment of $315,000, but which had declined in dollar worth to the extent that its owner deemed its book value to be $177,000. It was then sold for $53,344.70. Since the rate-making authority could permit only a fair return on the investment, it adjusted the rate basis of the utility downward so as to recognize that $53,344.70 was the amount that was actually invested. After the new owners acquired the property they invested new dollars in the enterprise, and about that time the public utilities commissioner became convinced that the old rate of depreciation for rate-making purposes did not harmo-

nize with the needs of the new situation. At that point a new rate of depreciation was ordered.

We now turn to the tax commission. It had recognized for many years before the new owners acquired the plant that the latter depreciated in value annually at a rate of $7,932. In its records it entered in one column annually "Material and Supplies", in another "Cost", in a third "Depreciation Reserve" and in a fourth "Cost plus Maintenance and Supplies, less Depreciation Reserve." The sums entered in the four columns for the year 1946 were $15,459, $315,846, $119,191, and $212,114. Presumably the public utilities commissioner, in fixing schedules of rates, deemed himself controlled by the fourth figure, that is, $212,114, because it represented cost plus maintenance and supplies less depreciation reserve. But we have noticed that ORS 308.545 authorizes the tax commission, in determining the amount of "true cash value", to take into consideration many factors including "statements or returns of the company filed in the office of any board, office or commission of this state." It provides that "no report, statement or return shall be conclusive upon the commission in arriving" at value. Accordingly, in its records the tax commission maintained another column headed "True Cash Value." The latter did not represent cost less depreciation reserve but reflected the tax commission's judgment upon the many factors which it believed revealed true cash value. The amount entered in that column in 1946 was $110,000. When the new owners took charge they introduced, as we have seen, new capital into the business and gave the plant the benefit of competent experienced management. Shortly annual losses were changed into annual gains. The latter before long became impressive. Thus, in 1948 operating income

was $25,241.59. In that year true cash value was only $100,000. At the same time cost, plus material and supplies, less depreciation reserve, was $232,916.96. A profit in that amount was certainly a good return, especially upon true cash value of only $100,000. Naturally, it could influence the depreciation rate as well as the amount of true cash value. Seemingly, it had that effect upon the tax commission, for it continued to apply the established rate of depreciation in determining the true cash value of the property. In that manner the tax commission did not do as the public utilities commissioner had done, that is, it did not create an acquisition adjustment.

The company argues that the establishment by the public utilities commissioner of a valuation for rate purposes lower than that decreed by the tax commission constitutes a situation in which the state gives with one hand and takes away with the other. It is true that the rates which the public utilities commissioner allows a utility to charge may influence the selling price of its plant, but we cannot hold that what the public utilities commissioner allows a utility to earn controls the tax commission in the determination of the dollar worth of the plant upon which the costs of government are levied. When the state "gives" something for one purpose but refuses to "give" the same thing for a distinct purpose, it is not a "taking away." The trial judge apparently felt that the new depreciation rate was largely determinative of true cash value. In so holding, he was, in our belief, in error. We do not mean that the tax commission could not have considered the new rate of depreciation had it been prescribed before the contested appraisal was made, but we hold that, in the absence of a clear statutory direction, the body entrusted with the duty of appraising

this property cannot be charged with failure to perform its duty because it did not deem itself bound by the fact just mentioned or by any other fact which the statute did not enjoin upon it in mandatory language.

Three witnesses, who had had experience in appraising local property, gave estimates, as witnesses for the company, of the junk value and the true cash value of the property. The concensus of their opinions was that the property's junk value lay between $50,000 and $85,000, and that its true cash value ranged between $75,000 and $115,000. The trial judge attached considerable weight to those appraisals. Mr. Manning, on the other hand, said that he would be prepared to recommend to a prospective purchaser a price of $240,000. The trial judge plainly did not deem Mr. Manning's statement as acceptable. The opinions of the three local experts, even though two of them are intimately connected with the company, are entitled to serious consideration. However, this court has said that the statutory language defining true cash value does not contemplate consideration of liquidating prices nor the junk value of going concerns. *Appeal of Kliks*, supra. The three experts stated facts which affect adversely the weight of their testimony. Mr. T. B. Waters, the first of the three, in computing value, employed the new depreciation rate inaugurated by the public utilities commissioner. Had the rate been employed in the year 1947, operating income would have been reduced from $11,593 to $2,783. Capitalizing those sums at six per cent, a very large change in value results ($47,000 versus $193,000). It is reasonable to believe that a consideration by Mr. Waters of the depreciation rate which the tax commission employs would have induced him to express an opinion nearer to that of the appraisement which the tax commission made. Mr. R. C.

Dale, the second of the company's experts, in determining true cash value, applied a formula which he termed a "rule of thumb." He accepted as a basis the factor of earning power and for it he took figures as adjusted by the public utilities commissioner's depreciation rate. The third expert, Mr. E. M. Chilcote, used similar figures and admitted that his familiarity with the values of the various items of equipment of the plant was not great. All three of those witnesses, in reaching their opinions, gave material weight to the fact that no salaries were paid by the company to its president and directors. All three assumed that a substantial amount of compensation should be paid to the president at least. Mr. Manning, in reaching his opinion, did not believe that the absence of salary payments was a controlling factor.

In mentioning the above factors which affect the testimony of the three experts called by the company, we do not deprecate the witnesses' qualifications as experts, but we believe that the factors which we mentioned lessened materially the weight of the experts' testimony. It was the company's duty to overcome the presumptions which we have mentioned. To accomplish that purpose it was essential that the company should show that the methods employed by its witnesses were a superior means of establishing value to that employed by the tax commission. We do not believe that their methods were superior to those of the tax commission.

We have mentioned the fact that Mr. Lorenz, the president of the company, has never been paid a salary. The company pays a substantial salary to only one individual who serves in a managerial capacity. It will be recalled that until the new boiler was installed in 1950 Mr. Lorenz had given 75 to 80 per cent of his time to the utility, but that since then the demands

upon his time have been materially lessened. He expressed the belief that in the period when he was giving most of his time to the company a reasonable salary for him would have been $7,500 or $10,000 annually. The company argues that the facts just mentioned should have been considered in determining true cash value and that if they had been given effect the result would have been a lowering of true cash value. The argument is that when operating income is lowered, value declines. If the argument is that allowance should have been made for something not, in fact, paid for, this court will give it no attention. However, since the statutory definition of true cash value looks to the amount the property would sell for, any fact bearing upon net income is important. It is contended that a purchaser would have to pay for the services which Mr. Lorenz rendered unrecompensed, and that the necessity to do so would materially affect the purchase price. The company did, in fact, receive at no cost valuable services. That the company received the services gratuitously cannot result in a lowering of the property's value unless those services would be necessary to a purchaser and would not be rendered voluntarily. The record shows that when this property was in other ownership, the plant manager was the local person and that he was completely in charge of operations. He was described at the trial as the "No. 3 man" in the organization, there being above him two officers of the larger general business of which this plant was a small unit. It, therefore, seems clear that this plant was not expected to support from its earnings the salaries of several people other than the local manager. After Mr. Lorenz and the manager had restored the plant to standard condition, the plant had need for only a small part of Mr. Lorenz' time. As

pointed out at the trial by a commission witness, the problem of how important directors' salaries would be in the estimation of another purchaser would depend upon who that other person would be. It was not shown at the trial that the unpaid services were absolutely necessary; that is, it was not shown that a new owner would have to have them and pay for them. Furthermore, there was testimony, standing unrefuted, that consideration was given to this company's "individual problems" in reducing the formula values used by Mr. Manning, and we cannot hold, on the basis of what the company showed, that there should have been a further reduction because of the fact that Mr. Lorenz donated his services.

▪ We are left with a contention of the company that the tax commission should not have begun its calculations with historical cost ($463,609.02) but with the cost to these owners ($53,344.70), plus additions ($179,000). We have already recognized that cost less depreciation is an acceptable method of approaching the determination of true cash value, but we have not said what is the proper point at which to begin. In the Kliks case, the facts presented a building which the taxpayers had acquired for approximately $10,000 and had improved at a cost of about $900. Testimony showed that the original cost had been at least twice that much to its builders. The new owners had acquired the property in the exigency of a sale to satisfy a defaulted mortgage. Application of the assessment ratio to an appraisal of $18,160 was affirmed. This court said that the statutory words "at a voluntary sale made in the ordinary course of business" precluded the use of liquidating prices. Turning to the instant case, we find that the parties placed different interpretations on the circumstances surrounding the

sale to these owners. The commission urges us to treat the sale as one of a forced nature which caused the price to be artificially low while the company says that the sale was conducted at arm's length and represented the best price which the buyer would offer and the seller accept. We have sufficiently stated the circumstances in preceding paragraphs. It is our belief that the price was not one which a vendor would have accepted in the operation of a normal market. We think that the pressure of circumstances created a depressed price and forced a reluctant acceptance. The transaction did not fit the statutory words of "voluntary" and "ordinary course of business." That being the situation, the tax commission was not required to recognize the price as true cash value. See annotation 160 ALR 679.

■ *Appeal of Kliks,* supra, according to our belief, sustains the conclusion just stated. Both parties have cited the leading case of *Sweet, Inc. v. City of Auburn,* 134 Me 28, 180 A 803, which exemplifies the decisions which recognize that where value is concerned many factors are involved and that a temporary depressed sale price is not a binding guide. In that case, the assessed value of the property was materially in excess of what the taxpayer had paid for the property. The court recognized the depression-born conditions of the sale and said: "If, during a time of crisis it is impossible to determine the true worth of real estate by reference to the price which such property will bring in the market, resort may be had to other factors." The tax commission's method whereby it determined true cash value is consistent with the practice recognized by the Maine court and by the statutes which we have cited. That it chose at one time to give greater weight to the sales price than it did in the

challenged assessment is not a ground for invalidating its action.

■ The above considerations persuade us that the tax commission properly continued the use of historical cost and was not required to adopt the price at which the company acquired the property.

■ Having analyzed the contentions of both parties, we hold that the company failed to sustain the burden of showing that the tax commission, in the performance of its statutory duties, erred in determining the true cash value of the company's property.

The decree of the circuit court is reversed.