Argued December 14, 1937; affirmed March 1; rehearing denied
March 29, 1938

APPEAL OF KLIKS ET AL.
(76 P. (2d) 974)

In Banc.

*C. W. Redding*, of Portland, and *B. A. Kliks*, of Mc-Minnville (Dorothy L. Kliks, of McMinnville, on the brief), for appellants.

*Earl A. Nott*, District Attorney, of McMinnville, and *James G. Smith* and *Charles V. Galloway*, of the State Tax Commission, for respondents.

ROSSMAN, J. The appellants challenge the validity of an assessment made March 1, 1935, of an apartment house property situated in the city of Mc-Minnville and owned by them. The assessor of Yamhill county appraised the building as worth $18,800, and, since he assessed property of that kind at approximately 45 per cent of its appraised value, assessed the building in the sum of $8,450, to which he added $450 as the value of the lot, total $8,900. Upon the appellants' petition for a review the Yamhill County Board of Equalization affirmed this assessment. Appellants then appealed to the State Tax Commission, the three members of which are the respondents in this proceeding, and requested the commission to reduce the assessment upon the lot to $300 and that upon the building to $4,000, total $4,300. The commission found that the value of the entire property was $18,160, and reduced the assessment to $8,300—lot $450, building $7,850. An appeal was next taken to the circuit court which, in a written opinion, deemed the assessment of $8,300 "fair and just." It denied the appellants' prayer. The appellants then appealed to this court.

The petition which the appellants presented to the Board of Equalization is the only instrument which assumes the form of a pleading. Referring to the building, it avers:

"Said property is now assessed in the sum of $8,450. The petitioners herein set out that such assessment is unjust in that such assessment is too high, and that the assessment is out of proportion entirely from that of any other building in the city of McMinnville. The petitioners represent that the assessment on this build-

ing is due to an error by which it was thought that the building was a concrete building, but, in fact, it is a frame building covered with stucco. \* \* \* Before purchasing this building, the petitioners carefully instructed architects and builders to make an appraisement of the property and their conclusion was and is that it can be reconstructed for $10,000 with a better and more serviceable building. Petitioners allege that such building can be replaced at any time during this year from January 1, 1935, for less than $10,000 with a better and more serviceable building.''

It will be observed that the appellants claim that the assessing officials mistook the exterior of the structure for concrete. We have read the transcript of testimony carefully and find no warrant for this contention. We shall consider it no further.

Before considering the contentions (1) that ''such assessment is too high'' and (2) that ''the assessment is out of proportion entirely from that of any other building in the city of McMinnville,'' we shall first review briefly the parts of our laws that are applicable to this proceeding.

Article I, § 32, Constitution of Oregon, provides:

''All taxation shall be uniform on the same class of subjects.''

Section 69-101, Oregon Code 1930, directs that all non-exempt real and personal property

''shall be subject to assessment and taxation in equal and ratable proportions.''

Section 69-231, Oregon Code 1930, as amended by 1933, Session Laws, chapter 142, page 158, recites:

''\* \* \* Said assessor shall enter in such assessment roll a full and complete assessment of such taxable property \* \* \* on March 1 of said year \* \* \*; and said lands or town lots shall be valued at their true

cash value, taking into consideration the improvements on the land and in the surrounding country and also the use and usefulness of such improvements, and any rights or privileges attached thereto or connected therewith, the quality of the soil * * * True cash value of all property shall be held and taken to mean the amount such property would sell for at a voluntary sale made in the ordinary course of business, taking into consideration its earning power and usefulness under normal conditions.''

Sections 69-301 to 69-308, Oregon Code 1930, as amended by 1933 Session Laws, chapter 446, page 837, provide that in each county the county judge, county clerk and the county assessor shall constitute a board of equalization; that public notice shall be given of the board's annual meetings; ''and that it shall be the duty of persons interested to appear.'' These sections also state that if it shall appear to the board that any property is ''assessed under or beyond the actual full cash value thereof, said board may make proper correction of the same.'' Section 69-401 creates the State Tax Commission composed of three commissioners, and adds that ''each commissioner shall be skilled and expert in matters of taxation.'' Section 69-402 requires that each commissioner shall be assigned to one of the three departments therein mentioned, one of which is ''(b) valuation and assessment.'' Section 69-404, in defining the duties of the commission, states that it shall be the commission's duty ''to require all assessments of property in this state to be made according to law.'' Section 69-501 provides that the commission shall ''do and perform any act, to give any order or direction to any county board of equalization or to any county assessor as to the valuation of any property or class or classes of property, in any county, which in the commission's judgment may seem just and necessary to the end that

all taxable property in this state shall be listed upon the assessment rolls and valued and assessed according to the provisions of law, and equalized between all taxpayers.'' Section 69-502 provides that if the commission ''shall ascertain that any taxable property is omitted from the assessment list, or not assessed or valued according to law, it shall bring the same to the attention of the assessor.'' Section 69-503 follows: ''The tax commission shall have the power to direct and to order any county board of equalization to raise or lower the valuation of any taxable property and * * *.'' Section 69-506, as amended by 1933 Session Laws, chapter 7, page 25, provides: ''Any taxpayer or taxing unit may appeal to the tax commission by filing with the county clerk * * *.'' Section 69-507 provides: ''Any taxpayer feeling aggrieved by any order of the tax commission shall have the right of appeal to the circuit court * * * such appeal shall be informal and summary * * *. Any of said parties, or the state tax commission may appeal from the decision of the circuit court to the supreme court in the same manner as appeals are taken in suits in equity * * *.''

January 17, 1935, B. A. Kliks and Louise B. Kliks purchased the property involved in this proceeding. It is a lot 56 by 110 feet in size, located in the city of McMinnville, upon which there stands a two-story apartment house, built in 1926, 36 by 96 feet in its ground dimensions. The building has a concrete basement 38 by 53 feet in size. In the structure are 16 apartments each of which includes a bathroom. The largest of the apartments consists of three rooms. The building is of frame construction with a stucco exterior. Describing it, Mr. Kliks said: ''The building puts up a very good front,'' but added that the workmanship and materials were inferior. He swore that the roof leaked

when the appellants purchased it, and that some of the joists and girders were too small. In the composition of the stucco non-waterproof cement was used, and in the construction of the concrete basement the builder used unwashed bank gravel. As a result of these deficiencies the roof had to be replaced, the building settled in some places, some of the stucco fell off, and the appellants were compelled to treat other parts of the stucco so as to make it moistureproof. The plumbing, according to one of the witnesses, was third-grade, and the same witness declared that the inside woodwork "is a cheap finish." The building is equipped with an automatic refrigerator system and the floors, in part, are made of hardwood.

The above is virtually the only description which the record affords of the building. No witness told whether the building has a sloping or a flat roof, nor mentioned the material out of which it was made; whether the building has large windows, many in number, giving a cheerful interior, or only small ones is unknown to us. Likewise, no one mentioned whether the apartments are well designed or whether excessive space is consumed in hallways and other unrentable areas. The record does not disclose whether the building's heating plant is adequate or is a source of complaint by the tenants; in fact, the record does not indicate whether the building is heated by steam, water or hot air. Likewise, the record does not disclose whether the plaster was left rough for kalsomine treatment, or whether it was given a finish coat upon which attractive wallpaper has since been added. The kind of the light fixtures and the numerous other features often found in buildings of this kind was not mentioned. The height of the ceilings and the kind of wood used in the interior finish is not disclosed by the record. While

Mr. Kliks complained that two of the apartments are too small and that the building has too many apartments consisting of only one room and kitchen, neither the size of the rooms nor the width of the halls was stated by anyone. No photographs of the building or floor plan of any part of it was introduced in evidence.

Mr. Kliks testified that the appellants acquired this property January 17, 1935, from the Fidelity Building & Loan Association of Salt Lake City, Utah. His description of the transaction is somewhat incomplete, but apparently the concern just mentioned had come into possession of the property through the circumstance that it was the mortgagee of a defaulted $20,000 real estate mortgage placed upon the property in 1926. Taxes in the amount of $2,000 were delinquent when the appellants acquired it. Under the terms of their contract they paid the company $1,500, conveyed to it a farm which Mr. Kliks at that time valued at $6,000, discharged the delinquent taxes, paid a commission of $500 and some outstanding accounts of the previous owners in the amount of $400. Before the Board of Equalization he swore that by reason of these payments and the conveyance the apartment house property "cost approximately $10,000". However, upon rebuttal in the circuit court, he testified: "We were giving these people (mortgagee) about $9,000." The appellants expended upon the property $900 in repairs and improvements which apparently were completed before March 1, 1935, when the assessment was made. This work, among other details, provided the building with a new roof, repaired the broken stucco and rendered the exterior walls moistureproof.

Mr. Kliks, who is an attorney, but who has had extensive experience upon his own account in the construction, purchase and sale of apartment house prop-

erties, testified that in 1926 this building could have been built for $11,000, and that it was insured for $8,250. A. F. Arthur, a building contractor, expressed the belief that in March, 1935, the building could have been duplicated for "around $11,500 to $12,000", but that as thus built it "would have been a real building", that is, properly constructed. V. C. Cochrane, a contractor, believed that he could have replaced the building in March, 1935, in conformity with the Portland building ordinances, for $12,000. Charles W. Redding, an attorney, who has represented Mr. Kliks in the purchase and sale of many properties, expressed the opinion that in March, 1935, the lot "was not worth to exceed the assessed valuation of $450 * * * and the building, in my opinion, could be replaced—basing my opinion upon what estimates I have made of better constructed buildings—at $12,500." Edgar A. Linden, a McMinnville lumber dealer, testified that during the course of the building's construction one of its owners told him that it cost "in the neighborhood of $18,000" to build, but that this statement could not have been true because "the building could not have cost at that time over $14,000". The building was constructed in 1926. Linden next expressed a belief that March 1, 1935, due to declines in the cost of construction, the building could have been built "for not to exceed $11,000". J. H. Stewart, a building contractor, submitted an affidavit in which he swore that in 1935 this building could have been built for $10,000—however, as a superior structure. The foregoing were witnesses presented by the appellants. We shall now mention the appraisals and estimates of the respondents' witnesses.

W. O. Osborn, assessor of Yamhill county, testified that in 1932 the property in question was appraised by him, with the assistance of the State Tax Commission,

as worth $24,259 in 1931, assuming standard construction, but that, owing to inferior construction and the depreciation which had occurred since completion, the appraisal was reduced to $18,800. He declared that 1931 was taken as a base for all assessments in the county. The value of buildings built prior to that year was determined by the use of 1931 construction costs, regardless of whether costs were greater or less in the year when construction occurred. In this way he secured uniformity. Value for the ensuing years was dealt with as follows, according to Osborn: "We would not touch that assessment for five years, then we would take off two per cent off of that, or ten per cent, which we are doing for the 1937 taxes." Thus, the 1935 assessment was the same as the 1931 assessment. He swore that appellants' property was assesed in the same manner as all other property of like kind in the county. Arthur A. Selander, a registered civil engineer, former contractor and appraiser, became chief appraiser for the State Tax Commission. He described at length a method of appraisal which he compiled in his first year's employment with the tax commission and which has since been printed as a manual for the guidance of his staff and for the assistance of assessors. The following describes his method: "The basis for the factor book is Portland prices of 1929 which practically is 1930—January and February, 1930. * * * We went out in the field and interviewed materialmen to get the cost of materials and labor, and then after we had set up our schedules, we went out and actually tested them to see that they would work out as we planned they should. We got costs. Breakdown costs the same way." He next described selected unit costs such as concrete and plumbing which his method also employed. Still other units represented the cost of a

standard room, to the cost of which was added whatever conveniences such as heating and light fixtures the room possessed. His method also took note of cost of construction per square foot. The cost of reproduction obtained in this way was compared with actual prices obtained in sales of property whenever prices were available. Vacancies, poor location, inferior construction, bad reputation of the property, etc., were deemed proper grounds for deductions from values otherwise established.

Selander, after describing his familiarity with the appellants' property, swore that it was appraised in 1931 as worth $24,259, assuming proper construction, but that, since its construction was inferior, he deducted from this figure 10 per cent, together with 5 per cent for poor condition. He also allowed 2½ per cent annual depreciation for three years. These deductions total 22½ per cent. Seventy-seven and one-half per cent of $24,259, or $18,800, was his appraisal of the building in its 1931 condition. In 1936 when the commission received the appellants' appeal from the ruling of the Yamhill County equalization board, Selander again appraised the building. He again endeavored to determine its 1931 value. He employed the same method as before, but carried his calculations into greater breakdown detail and arrived at the conclusion that the property was worth in 1931 $18,160. He again allowed 22½ per cent deduction for poor construction, poor condition, and three years' depreciation. This resulted in lowering the assessment to $7,850. He swore that when the 1931 appraisal was made the building was protected with a policy of fire insurance in the amount of $25,000.

The above is a review of all of the opinions expressed by the witnesses concerning the value of the

structure. We shall now mention the testimony which reveals the property's net income. Before the circuit court Mr. Kliks swore that the building produced virtually no income in 1934. In 1935, according to his testimony, the apartments "rented from $16 to $28 and would average not to exceed $23.50, or something like that." The building's manager was given, besides a monthly salary of $50, possession of one of the apartments rent free, leaving 15 to produce income. As a witness in the circuit court, Mr. Kliks mentioned some items of expense incurred in the operation of apartment houses, but, since he gave neither the total income nor total expense, nothing is gained by considering the few items which he mentioned. He declared that when he assumed possession in January, 1935, the building "had only four of five occupants, with a total income of $100", but that by exerting himself he secured enough tenants so that in December of the same year all of the apartments except two or three were occupied. Mr. Kliks, in August, 1935, told the board of equalization that at that time 11 or 12 of the 15 rentable apartments were occupied, and added, "This brings us a gross of $226 to $246, but there are the following fixed expenses". He then enumerated items totaling $160, and said, "It is clear that the amount of the income will just about pay taxes, insurance and repairs but leave nothing for depreciation". The specific items which he mentioned did not include insurance and taxes, but did include "painting, papering and kalsomining after each tenant moves, an average of $20 per month". Selander produced a card upon which he and a member of his staff, named Daue, made notations while they appraised the property in 1931. It stated that the building was then fully occupied and was producing a gross annual rental of $4,800. Mr. Kliks produced no books of

account or other entries showing income and expense. The foregoing is a review of substantially all of the evidence indicating revenue and outlay. We come now to a consideration of the testimony upon which the appellants depend to support their contention that this property was assessed relatively high.

The appellants contend that the following properties situated in McMinnville are assessed at a lower relative value than their property: (1) the Earl Wright building: built about 1880; frame construction; one story in height; used for store purposes; rental approximately $90 per month; assessed at $770 with an additional assessment of $2,400 upon its lot. According to the assessor's uncontradicted testimony, this building "is an old wooden building" which has a good earning power due to its location. (2) the Wright building: built in 1893; brick construction; two stories in height; 60 by 100 feet in size; producing $60 a month ground floor rental; assessed at $7,370, together with an assessment of $3,900 upon its lot. (3) Yamhill Hotel: built in 1885; three-story brick structure; ground area 54 by 105 feet; occupied by stores and a restaurant on the ground floor; assessed at $6,000 and the lot $4,500. (4) Bays Hotel: built in 1925; exterior walls of concrete; stage depot and stores on ground floor; 32 rooms and six baths on second floor; assessed at $9,900 with a ground assessment of $3,600. The cost of constructing this building was $25,880. The record seems to indicate that the ground floor contains 9,000 square feet and, if this is true, the second floor is, possibly, of the same size. The evidence does not disclose the income produced by the property, but seems to indicate that the owner somehow lost the property, possibly, through a mortgage default. (5) Fenton building: built in 1910; brick construction; 90 by 100 feet in size; stores on

the ground floor; second floor devoted to lodge rooms and some offices; assessed at $9,200, with an additional assessment of $4,200 upon the lot. (6) Fischer building: built in 1927; 60 by 100 feet in size; assessed at $5,400 and the lot, $2,400; height, occupancy and income of this building is not disclosed. Concerning the assessment upon this building, Mr. Kliks testified: "It is assessed rather high * * * It is the nearest in line with anything that you can find."

Besides the above-mentioned McMinnville buildings, Mr. Kliks described an apartment house located in Portland and known as the Walldorf Court Apartments which, according to his testimony, was encumbered with a first mortgage of $36,000 and a second mortgage of $15,000. He swore that it was assessed for $11,000. He described the efforts of the unfortunate owner of this mortgage-encumbered structure to save something for himself during the course of rapidly declining values and how, finally, the mortgagees themselves were forced to sacrifice parts of their mortgages in order to induce someone to operate the property. Whatever value might be disclosed under such conditions would scarcely be a safe guide to follow in the present instance. The character of this building, of its appointments, etc., is not disclosed by the record. Osborn and Selander described an apartment house structure in Newberg which they swore was the exact counterpart of the appellants' building. Both were positive that the two buildings had been constructed from the same plans. Osborn testified that this structure was appraised in 1932 at a value of $25,670, and Selander swore that a Mr. Bonnell, who was a member of his staff, appraised the building as worth $25,670 as compared with $24,259 which he (Selander) deemed the value of the plaintiffs' property.

The McMinnville buildings which Kliks claims were favored by the assessor appear to be located in the business section of the city. His apartment house is located in a residential area. Selander declared that the business buildings described by Kliks afforded no basis for a comparison, declaring that size alone governs neither construction cost nor value. He pointed out, "The main cost in apartment houses is what is in between the walls * * * An apartment building is cut up into a lot of rooms and has a lot of plumbing; it has additional items that we do not in a large area with large rooms and very little partitions and very little plumbing. It is what is embraced within the outside walls would be a better comparison."

Selander, referring to the latter part of 1934 and the early part of 1935, declared, "Sales did not mean very much". He gave as his reason, "There is very few willing sellers and willing buyers". He made no other reference to actual sales. Mr. Kliks, apart from testifying that he bought "this summer (1936) an additional lot there" 50 by 74 feet in size, for $70, made no other reference to actual sales in McMinnville. If there are other apartment houses in McMinnville, and if any of them were recently sold, no witness mentioned such facts.

The above, we believe, constitutes a fair review of the evidence. Of course, details have been omitted. Other omitted matters are largely expressions of opinions concerning the value of the buildings which Mr. Kliks claims were favored by the assessor, and other opinions concerning the reproduction cost of one or two of those buildings.

Although we have read appellants' brief with great care, we are not certain that we understand their in-

terpretation of the legal principles governing the assessment of property. Their arguments refer to cost price, earning capacity, reproduction cost, market price, value to owner, and even to liquidation value, but do not state clearly which, if any, of these determine value for the purpose of assessment. While they do not offer a clear definition of the word "value" as employed in assessment statutes, the appellants, nevertheless, argue with both vigor and feeling that their property has been overvalued. They, like many other tax-burdened property owners, apparently embrace the time-honored axiom,

"All things in moderation keep,
The King should shear, not skin, his sheep."

■ We return to the constitutional and legislative enactments quoted in a preceding paragraph and which delineate the assessor's duties besides limiting his powers. From these it will be noticed that our constitution and statutes require relative uniformity. From Lutz Public Finance (3d Ed.), p. 529, we quote:

"After all, the fundamental task of a good assessment is that of establishing reasonable and equitable relations among the same parcels or tracts of land in an assessment district and throughout the state. Relative uniformity is, after all, the basic requirement of property valuation for tax purposes."

■ All non-exempt property, regardless of use, size, shape or location, has in common the element of value and this element can be expressed in terms of money. Money value is seized upon by the state for two purposes: (a) as a basis for the distribution of the tax burden; and (b) as the most effective means whereby relative uniformity can be secured. The second purpose is partially included in the first. The ultimate objective

of appraisement and assessment is to bring about the distribution of the cost of government in just relationship to the value of each taxpayer's property. Unless the assessment exceeds the property's value the individual taxpayer is not injured by an assessment which is too high or too low, provided the same error in proportionate degree is made throughout the tax levying district. Thus, uniformity is more important to the taxpayer than appraisal in terms of the correct number of dollars.

We set forth in preceding paragraphs descriptions of the appellants' property and also of the properties which they claim were favored by the assessor. The descriptions are meager, it is true, but the record supplies nothing more. We also set forth the assessor's reduction of all the properties to their common denominator—dollar value. The mere fact that some of the buildings are larger than the appellants' and yet are appraised in substantially the same amount does not necessarily indicate lack of uniformity. A larger building receiving a relatively low assessment may have an antiquated exterior, and its interior may be virtually free of partitions and such expensive equipment as plumbing, hardwood floors, ornate lighting fixtures, etc., the inclusion of which in the smaller building would add greatly to its cost. The observation just made has application to one or two of the buildings mentioned by the appellants. The circumstance that a building assessed in a small sum produces as much income as another assessed in a larger sum may not amount to favoritism. The building first mentioned may be old and of slight value, yet may be the means whereby a favorably situated lot develops its great earning power. That seems to be the case with the Earl Wright building

above described. To make possible a comparison which will reveal lack of relative uniformity, if it really exists, the record ought to contain detailed information concerning age, size, cost, location, income, expense, vacancies, construction materials, design and all other information which a prudent appraiser would demand before expressing an opinion. Exterior measurements with guesswork concerning income do not suffice. Information which a prudent investor would reject as insufficient is likewise an unsafe guide to the courts. We believe that anyone offered a choice of the various properties mentioned by the appellants, including their own, but who knew no more about them than is disclosed by the record would find it impossible to make an intelligent selection.

■■■ Notwithstanding the meager information placed before us by the parties, the appellants claim that it is our duty, upon this appeal, to act as though we 'were assessors, and, in support of that contention, rely upon *Kimber v. Schuylkill County,* 20 Pa. 366, from which a quotation is made in the specially concurring opinion of Mr. Justice BROWN in *Smith Securities Co. v. Multnomah County,* 98 Or. 418 (192 P. 654, 194 P. 428). In the Pennsylvania case the court said: "The judges when hearing these appeals, are acting as assessors of taxes". If by this statement the court meant that when a court reviews the validity of an assessment it performs all of the functions of an assessor, the statement was unnecessary to the decision of the case, which involved nothing more than an issue concerning ownership of the property affected by an assessment. The objectors contended that the property was owned by their tenant, and not themselves. The appellants also rely upon several decisions by the supreme court of

Washington, all of which, with the exception of *Swanson v. Snohomish County*, 191 Wash. 389 (71 P. (2d) 170), and *Bellingham Community Hotel v. Whatcom County*, 190 Wash. 609 (70 P. (2d) 301), are reviewed and reconciled in 12 Wash. L. Rev. 205. Washington employs the doctrine of constructive fraud, holding that whenever the taxpayer has been the victim, for instance, of an arbitrary assessment the assessor's conduct constitutes constructive fraud and justifies judicial relief. Since our statute provides for an appeal from the tax commission to the courts, we believe it is unnecessary to add to the uncertainties by resort to a term of such doubtful meaning as "constructive fraud". Ordinarily well-established principles and rules are at hand. The statute provides that the appeal to the circuit court "shall be informal and summary", and from the "circuit court to the supreme court in the same manner as appeals are taken in suits in equity". Since error is never presumed, the appealing taxpayer has the burden of proof, and since courts always presume, in the absence of evidence to the contrary, that official duty has been properly performed, the appealing taxpayer is met with a presumption of official rectitude. The latter is not a mere legally created makeweight, but is based upon the assessor's superior knowledge of the property of the appellant and of all other property in the district. For the court to acquire like knowledge of values would require extended study. Knowledge of the protesting taxpayer's property alone does not suffice—uniformity requires knowledge of every parcel of property in the assessment district. Invalidation of a single assessment may operate as the loosing of a stitch which causes the entire fabric to ravel. These circumstances have impelled courts to attach weight to the presumption that

the assessor faithfully performed his duty. Clear and convincing evidence is required to overcome it. Again much of the work of the assessor is non-judicial and the doctrine of separation of powers, a practical device for the division of labor, induces courts to hold aloof except where the assessor has ignored his constitutional and statutory duties, inadvertently or otherwise.

Thus, the appellants assumed the burden of proof when they undertook this appeal, and their appeal confronted them with a presumption that the assessor's appraisals had not violated the requirement of relative uniformity. Everything above said, in our opinion, is in harmony with the decisions cited by the appellants: *Clatsop County v. Oregon American Lumber Co.,* 155 Or. 551 (65 P. (2d) 1); *Smith Securities Co. v. Multnomah County,* supra; *Douglas Land Co. v. Clatsop County,* 87 Or. 462 (169 P. 790); *Weyerhaeuser Land Co. v. Board of Equalization,* 85 Or. 434 (165 P. 1164); *Northern Pac. Ry. Co. v. Clatsop County,* 74 Or. 250 (145 P. 271); *Southern Oregon Co. v. Coos County,* 39 Or. 185 (64 P. 646); *Oregon & Cal. R. R. Co. v. Jackson County,* 38 Or. 589 (64 P. 307, 65 P. 369); and *Oregon Coal & Nav. Co. v. Coos County,* 30 Or. 308 (47 P. 851).

██ The old structures upon expensive lots, to which the appellants call our attention, do not seem to constitute a fair basis of comparison. The Bays Hotel might be a comparable building if the description of it were adequate. The only structure similar to the appellants' is the Newberg apartment house which is assessed at a substantially higher figure. We readily agree that it is not necessary for a protesting taxpayer who claims favoritism to describe each specific item of taxable property in the district. A reasonable number of typical

and representative properties suffice: 61 C. J., Taxation, p. 848. But we do not believe that those cited by the appellants are typical or representative. In our opinion, the appellants have not overcome the presumption that the assessments effected relative uniformity.

■ We now consider the words "true cash value" which the statute above quoted selects as the basis of assessments. True cash value is not necessarily the equivalent of market value nor of liquidating value. The word "value", according to Mr. Justice Brandeis in *State of Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission,* 262 U. S. 276 (67 L. Ed. 981, 43 S. Ct. 544, 31 A. L. R. 807), "is a word of many meanings". Value may vary according to the ebb and flow of economic conditions. Even when economic conditions remain stationary the word "value" may undergo changes of significance as we place before it, one after another, such words as "intrinsic", "market", "sound", "speculative", "investment", etc. Again, it may be dependent upon the use to which the property is being applied. True cash value ordinarily means the sum which an owner should receive in the event his property is taken through the exercise of the power of eminent domain, or the amount which a public utility, if owner, could employ in establishing a rate base. The statute above mentioned, in employing the words "true cash value", declares that consideration should be given to the improvements upon the land, to their usefulness, to the character of the surrounding country, and to any privileges associated with the property. Next, the statute defines true cash value as "the amount such property would sell for at a voluntary sale made in the ordinary course of business, taking into consideration its earning power and usefulness under normal conditions."

■ The words "normal conditions" undoubtedly modify not only the words "earning power" and "usefulness" but also the words "would sell for at a voluntary sale". In other words, the author of the act did not want the price derived in a period of economic maladjustment, whether the latter took the form of a depression or of a boom, to be regarded as the true cash value. The employment of the words "at a voluntary sale made in the ordinary course of business" precludes the use of liquidating prices. Market price may fluctuate greatly even in comparatively short periods of time, but stability of government demands stability of income which would be impossible if income underwent the sudden changes of market price. "Values of real estate and fixtures thereon are more or less constant over a period of years" said the supreme court of West Virginia in *Central Realty Company v. Board of Equalization and Review*, 110 W. Va. 437 (158 S. E. 537). That constant value which levels the effects of depressions and booms is the value which our statute seeks when it employs the qualifying words "normal conditions". See *Tremont & Suffolk Mills v. City of Lowell*, 271 Mass. 1 (170 N. E. 819), and *Alfred J. Sweet, Inc., v. City of Auburn*, 134 Me. 28 (180 Atl. 803). The words "the improvements  *  *  *  the use, usefulness of such improvements" as well as the other words "earning power" and "usefulness" were very likely intended to avoid the possibility of costly improvements of value only to the owner and, therefore, possessing no market value, escaping taxation or being assessed only as "tear down" propositions; for instance, golf courses, railway depots, factories constructed for the special needs of the occupant, and the mansion built for a wealthy person in a small town where he alone can afford to possess it. Assessments

at market value might enable all of these properties virtually to escape taxation. An instance or two will suffice. In *State ex rel. Oshkosh Country Club v. Petrick,* 172 Wis. 82 (178 N. W. 251), the court declared: "It is a matter of common knowledge that there is no sale for a golf course in or adjacent to a city of the size of Oshkosh." And since the statute required that property should be assessed "at the full value which ordinarily could be obtained therefor at private sale", held that the golf course should be assessed, not as a golf course but as farm land. Thirty-five thousand dollars had been expended in converting it from farm land into a golf course. But where the statute is not primarily concerned with market value, but with true and actual value, a different result is reached. In *Underwood Typewriter Co. v. City of Hartford,* 99 Conn. 329 (122 Atl. 91), the court held that a costly factory especially adapted to the needs of its occupant should not be assessed as junk because of absence of market, but at its "true and actual valuation", these being the words of the statute. True and actual value, according to the decision, could be ascertained through consideration of original cost, reproduction cost, etc. In *People ex rel. New York Stock Exchange Bldg. v. Cantor,* 221 App. Div. 193 (223 N. Y. S. 64), affirmed in 248 N. Y. 533 (162 N. E. 541), the court held that the mere fact that the building which housed the New York Stock Exchange was unsuitable to the needs of any other concern in the country and would thereby constitute an encumbrance upon the site in the event the stock exchange discontinued operations, was no occasion for exempting the structure from taxation. Two statutory provisions were involved; one required property to be assessed at its actual market value, and the other provided that all property "shall be assessed at the full

value thereof''. The court held that the usefulness of the structure determined its assessment value.

Two excellent articles upon the subject of assessment and valuation are the following: Assessment of Real Property for Taxation, 35 Mich. L. Rev. 1217; The Valuation of Real Estate for Tax Purposes, 34 Col. L. Rev. 1397.

■ Thus, we see that all of the statute's words which define the term ''true cash value'' can readily be assigned a significant meaning. None of them can be ignored or deemed repetitious. Market value, even under normal conditions, is not controlling, although it is entitled to consideration. Tear-down values are not controlling if the improvement is useful to its owner or is likely to find a buyer when placed upon the market. Present market price as revealed in a depression or a boom is not determinative. The many circumstances like cost price, rentals, cost of reproduction, which should guide the assessor in determining true cash value, have already been mentioned sufficiently. True cash value is, therefore, the determining factor in making the assessment.

In the present instance, our information about the appellants' building is far from complete. We are satisfied that any reliable appraiser would refrain from expressing an opinion of the true cash value of the buildings if he knew no more about the latter than is disclosed by the record. He might hazard a guess, but would surely protest that it should not be deemed an opinion. Guesses have no place in the transaction of judicial business.

Osborn, the assessor, inspected the building before he made his assessment; in fact, he lives near it. Selander inspected it twice, taking careful note of its

materials, workmanship and of its condition. There is no reason for believing that Selander was incompetent or disqualified; the contrary clearly appears. The assessing officials took into consideration no improper fact. They used no improper methods but gave consideration to every available fact which was entitled to consideration. As already indicated, we are required to presume that the officials faithfully performed their duties and that their appraisements are in harmony with the requirements of the statute. The appellants' petition to the equalization board stated that before making the purchase architects and builders, at the appellants request, had carefully appraised the property and that in this manner the appellants found "that such building can be replaced at any time during this year from January 1, 1935, for less than $10,000 with a better and more serviceable building." It seems strange, if that statement is true, that the appellants paid $10,000 for it. Evidently the property was deemed worth more than the sum paid.

Without further analysis of the testimony, we express our belief that the circuit court did not err when it rejected the appellants' contentions and affirmed the assessment adopted by the State Tax Commission.

The decree of the circuit court is affirmed. Costs and disbursements will be allowed to neither party.

BEAN, C. J., and BAILEY, KELLY, BELT and RAND, JJ., concur.

LUSK, J., took no part in the consideration of this case.