Argued June 8, affirmed August 3, 1960

# ROSEBURG LUMBER COMPANY v.
# STATE TAX COMMISSION

355 P. 2d 606

*John C. Mull,* Assistant Attorney General, Salem, argued the cause for appellants. With him on the briefs were Robert Y. Thornton, Attorney General, and Theodore W. de Looze, Assistant Attorney General, Salem.

*George W. Neuner, Jr.,* Roseburg, argued the cause for respondent. On the brief were Long, Neuner & Dole and Eldon F. Caley, Roseburg.

Before McAllister, Chief Justice, and Rossman, Warner, Perry, Sloan, O'Connell and Goodwin, Justices.

GOODWIN, J.

This is an appeal by the defendants, in their capacity as members of the Oregon State Tax Commission, from a decree of the circuit court which set aside an order of the Commission and reinstated an order of the Douglas County Board of Equalization. The various orders affected the assessed value of standing timber in Douglas County for the tax year 1958.

The parties will be referred to as the taxpayer and the Commission. The matter was heard in the circuit court under the statutory review provisions of ORS 306.510.

The petition alleged that Commission Order VL 58-206 directly affected the taxpayer, that it arbitrarily increased the valuation of standing timber beyond its true cash value, and that it placed an unequal burden on timber owners in comparison with the owners of other property in Douglas County subject to *ad valorem* taxation.

Prior to the Commission Order, Douglas County, through its own efforts, had inventoried and appraised a substantial portion of the privately owned timber within its boundaries, which reach from the summit of the Cascade Mountains to the Pacific Ocean. In reviewing what had been done in Douglas County, as compared to the almost total lack of realistic appraisal in several other Oregon counties, the Commission formed the opinion that Douglas County's timber was listed on the assessment rolls substantially as it should be except that the assessed values were too low.

Douglas County had been engaged in the inventory and reappraisal of timber from 1949 to 1954, and the values placed on the tax roll were those established in 1955, three years before the Commission had been able to accomplish anything approaching uniformity among the other timbered counties of the state. Believing that the 1955 values were substantially lower than the values about to be placed on timber in adjoining and neighboring counties, the Commission issued instructions to the county assessor to use new values for various species and grades of timber similar to those established by the Commission's valuation division for the counties of Coos, Lane and Benton.

The assessor reported to the Commission that he would be unable, because of lack of time, to make individual changes in the assessment roll, but that he could increase all timber values for the 1958 tax year by a flat 50 per cent. The Commission approved this proposed alternative, and the assessor made the change.

The county board of equalization overruled the assessor and ordered him to place standing timber on the assessment roll at the previous year's values, i.e., those developed during the local reappraisal program in 1955. This action eliminated the 50 per cent increase. The Commission, in the order appealed from, reversed the board of equalization and ordered the 50 per cent increase restored.

Because the time element bears on whether the Commission acted arbitrarily, this is the chronology of events, as gleaned from the record:

February 28, 1958. The Commission wrote the assessor recognizing difficulty in revising the tax roll on an individual ownership basis for the 1958 tax year.

March 3, 1958. The assessor wrote the Commission that he thought a 75 per cent increase would be accurate for about 80 per cent of the timber in the county, but suggested a 50 per cent increase to be conservative, with plans to make individual increases in time for following year. The increase was applied.

June 9, 1958. The County Board of Equalization reversed the assessor.

July 7, 1958. The Commission commenced fact-finding hearings, which were adjourned from time to time, in the counties of Coos, Douglas, Lane, and Benton.

September 2, 1958. Fact-finding hearings concluded.

September 12, 1958. Commission issued order No. VL 58-206.

September 19, 1958. Taxpayer petitioned for judicial review.

September 24, 1958. Commission filed amended order, VL 58-206A.

October 15, 1958. Assessor's deadline for completing tax roll.

The transcript of the fact-finding hearings was received in evidence in the circuit court, by stipulation, and additional testimony was taken.

The order appealed from referred to the fact-finding hearings by these recitals:

"Obviously, with a record as voluminous and as technical as was presented, the Commission will require many weeks, and even months, in the analysis of the evidence adduced. Unfortunately, the Commission is not in a position to take that requisite time before rendering a decision, for the compelling reason that the assessment roll must be completed by the assessors, turned over to the sheriffs, and collection begun thereon. The primary purpose of taxation, after all, is to supply financial sustenance to the governmental entities

that depend upon it. It is preferable, of course, that the revenue derived therefrom be taken from each individual in true proportion to the value of the property owned, but in the final analysis, whether this can be done or not, nevertheless the revenues that flow therefrom must be forthcoming.

"As was pointed out, gross inequalities have long existed in the assessment of timber. Their correction cannot come immediately. Therefore, the Commission is of the opinion that it must act in the premises now, achieving the highest degree of equality and uniformity it can within the time limitation imposed, leaving for continued study and analysis in the future the bulk of the evidence adduced. It may well result that as a result of that activity substantial modifications in timber values will be necessary for the 1959 assessment year, and that substantial modifications in the data used, the sources of that data, and the application of that data will ultimately prove to be necessary. With this in mind, the Commission urges that members of the timber industry in particular continue to work with the Commission toward the resolution of this problem.

"Although many contentions were made regarding the log pond values, the logging costs, and the timber classifications utilized by the Valuation Division, there does not appear to be sufficient evidence to warrant a change in retail values established by the Valuation Division. On the other hand, the testimony as to the depletion periods in the various counties, the proper data to use in determining these depletion periods, the proper discount rate to be used in computing the deferment factor, the effect of government timber on the depletion period, and the effect of immature timber thereon, is such as to indicate much uncertainty in this field. Until it has time to more fully analyze the vast amount of evidence and theory on this point, this Commission is of the opinion that temporary relief should be provided the own-

ers of merchantable timber insofar as the discount for holding period is concerned. While the evidence is not conclusive, there is good reason to believe that a deferment factor of 0.30, which approximates that used by the Valuation Division for a 30-year depletion period will result in a reasonably close approximation of market value as envisaged by the statutes."

With reference to Douglas County, the order concluded:

"Upon consideration of this matter and in view of the time element previously discussed, this Commission is of the opinion and finds:

"(1) That the Douglas County assessor, although unable to apply the Valuation Division's recommended timber values to his 1958 roll by individual tracts, did accomplish substantial equalization between timber and other classes of property by applying a 50 percent increase to timber assessments over those for 1957.

"(2) That the order of the Douglas County board of equalization reducing timber assessments for the year 1958 by 33-1/3 percent resulted in timber being assessed at values not uniform or proportionate to values on other properties in the county.

"(3) That this Commission in determining valuations of timber must not only meet the requirements for uniformity within the county, but must see that uniform value standards and uniform valuation methods are used in each of the several counties.

"(4) That to accomplish these ends and do so within the alloted [sic] time, which is far too short for complete analysis of all available data, this Commission directs the Douglas County assessor to revise timber values on the 1958 assessment roll as follows:

"All timber values, including reproduction, pole

stands, immature merchantable, and mature merchantable shall be increased 50 per cent."

The question before the circuit court was whether the Commission's action in reversing the county board of equalization and ordering an across-the-board increase in the valuation of all timber in the county was arbitrary. There is no question about the Commission's power to enter such an order. ORS 306.090 through ORS 306.120, and ORS 306.130.

The pertinent portions of the record of the fact-finding hearings support the Commission's finding that there existed gross inequalities and inadequacies in the assessment of timber in the four named counties. For example, the Douglas County assessor testified that in his county, prior to the county's own reappraisal, timber was assessed at an average of 60 cents per thousand board feet. At the same time, the assessor testified, homes and business properties were being assessed at values more closely approximating their true cash value than was the case with timber. Timber holdings were found receiving different valuations within single ownerships where they lay across county lines.

The evidence tended to show that from $20 to $22 per thousand board feet was a fair average market value for mature Douglas fir timber on the stump, taking Douglas County as a whole. There was some evidence of higher values. The trial court apparently found that the board of equalization action, in eliminating the 50 per cent increase, was consistent with a retail value of $22 per thousand board feet. The Commission denied that $22 per thousand "retail value" or any other figure was binding upon the Commission in that its formula should not be applied to values not established by its own valuation division.

There was evidence tending to show that had the Commission used its own formula exclusively it could not have arrived at the exact result reached by the flat increase, without first establishing that a higher average market value prevailed in Douglas County than was found in the taxpayer's evidence at the hearing.

The court held that in ordering the reinstatement of the 50 per cent increase, the Commission did not follow its own established methods as employed in the other counties. This, the trial court found, was arbitrary.

Whether the action of the Commission was arbitrary or not depends largely upon whether the Commission in fact took into consideration the matters required to be considered by ORS 306.127 (2), and whether it gave proper weight to such considerations.

The statute requires the Commission to consider nine separate factors in arriving at appraised value: (1) species; (2) quality; (3) volume after allowance for defect and breakage (which depend in part on terrain and climate); (4) accessibility to point of conversion (cost of haul); (5) topography of the site and surrounding country (which affect logging and road-building costs among other things); (6) risk of loss due to fire, insects, disease and storms; (7) growing conditions; (8) carrying charges; and (9) total volume of timber in the area and the rate of its depletion.

The Commission, following the enactment of the above statute in 1955, worked out a plan which it considered to be both equitable and administratively feasible under all the circumstances, to assist the counties in bringing their timber valuations up to date.

Omitting technical details, the Commission attempts first to find the local market value of stand-

ing timber based on recent private and government timber sales.

### *"Retail Value"*

Sales data, it soon developed, covered relatively small tracts, and generally those sold for immediate logging. Sales data, however, reflected consideration in the market place of the first five items listed in the statute. Accordingly, the Commission decided to use sales data in arriving at a beginning figure which it calls "retail value" for standing timber of various grades and species.

### *"Wholesale Value"*

The Commission next undertook to give proper consideration to such matters as risk of loss, carrying charges, and growing conditions, all as affected by the length of time the timber may be held for future use. These considerations have no substantial effect on the price of stumpage sold for immediate removal, but tend to depress the price a purchaser will offer if he intends to hold the timber over a long period. Based on published studies in the field of timber taxation, its own data, and information received from the lumber industry, the Commission arrived at a concept of "wholesale value" which it applied to standing timber in recognition of the remaining above-listed considerations demanded by the statute.

### *"Depletion Factor"*

It is the position of the Commission that depletion, which is the last mentioned statutory consideration to be used in arriving at ultimate assessed value, should be based upon consideration of practices in areas no smaller than a county. In this case, the taxpayer has raised no issue with reference to the size of the area.

For the 1958 tax year, the Commission determined that in the four counties under consideration a .30 depletion factor should be used in the valuation of all timber, whether this happened to coincide with individual ownership depletion plans or not.

A depletion factor is based upon estimates which convert years (of contemplated holding periods) into percentages to be applied to "retail value" in order to arrive at "wholesale value."

The factor gives numerical weights to the several considerations listed in the above statute in arriving at a percentage rate related to a holding period of a given number of years. The Commission's .30 used in the other timbered counties in 1958 roughly accommodates a 30-year cutting cycle. The method of converting years into percentages is subject to some difference of expert opinion, according to the transcript, but is not a major issue in the instant case.

By taking market prices, and multiplying the so-called "retail value" by the depletion factor, a basic formula for arriving at assessed value works like this:

$22 Retail Value (multiplied by) .30 = $6.60 Wholesale Value.

$6.60 Wholesale Value (multiplied by) 20% assessor's ratio = $1.32 assessed value.

In order to illustrate by means of a formula what happens in a given county, it is necessary to go to the transcript of the Douglas County assessor's testimony taken at the fact-finding hearings. Apparently the 1957 assessed values were $1.35 per thousand board feet in a typical Douglas County zone. The exact method by which this value was reached is somewhat obscure, but if the assessor began with a $22 retail

price and a 30-year cutting cycle, using a 20 per cent assessor's ratio, the value can be rounded off at $1.35. The details of the specific formula were not spelled out.

The assessor in 1958 determined that the $1.35 figure was too low, and decided that an increase of 50 per cent, bringing the assessed value to $2.03, would be consistent with current timber prices. He testified that this increase was not based specifically upon an exact depletion rate or by actually formulating the other considerations itemized in ORS 306.127 (2). He said it was an approximation only. If he had used his own depletion rate, he would have used .36, which roughly accommodates a 25-year holding period.

As noted earlier, the Commission consented to his plan and the assessor prepared to make the roll accordingly. In the meantime, the Commission was proceeding with its studies, the results of which were recited at length in the preamble to the order appealed from, a portion of which has been set out above.

In those counties where a formula based on the Commission studies is employed, the assessed value will vary according to the retail value chosen as a starting point. If the depletion period used for a given county differs from that found in another county, this also will produce a variation in the ultimate result. The third variable is the assessor's ratio, that percentage of true value applied equally to all classes of property in the county. In Douglas County, the assessor's ratio had been 20% in former years, and he testified it would go to 25% in 1958 under his tentative plan.

Taking the average value of $22 testified to for Douglas County, and comparing the results under

alternate depletion factors and alternate assessor's ratios in tabular form, we find:

$22 × .30 = $6.60    $22 × .36 = $7.92
$6.60 × 20% = $1.32   $7.92 × 20% = $1.58
$6.60 × 25% = $1.65   $7.92 × 25% = $1.98

It is seen from the above tables that given a $22 average retail value for timber sold for immediate cutting, which was an average value supportable by the evidence most favorable to the taxpayer, and using a 25-year depletion factor of .36 with an assessor's ratio of 25%, which the assessor said were contemplated for the 1958 tax year, the Commission formula results in an assessed value of $1.98 per thousand board feet. This is five cents lower than the final value arrived at by the flat 50 per cent increase.

The five cents by itself does not loom large as a taxable valuation, but when multiplied by the billions of board feet of private timber in Douglas County, the tax consequences are considerable.

The other combinations of figures within the formula show even greater disparity between the $2.03 assessed value and values which may be arrived at by the use of the formula based on a $22 "retail value". For example, by using a 30-year depletion factor, the assessed value is $1.65 per thousand board feet or 37 cents below the figure reached by the flat increase.

The taxpayer contends that the arbitrary nature of the Commission order is demonstrated by working back from the known figure of $2.03 by any reasonable choice of depletion rates. The average retail price of stumpage thus worked back comes close to $30 per thousand board feet. The testimony showed that $30 stumpage was found only in isolated sales of prime timber. The trial court concluded that a $30 average

retail value could not be justified by the evidence in any manner.

A number of other formulae, or variations and combinations of plans, were testified to, but none came out with a figure equal to $2.03.

The Commission argued in its brief and upon oral argument that "Appraisals are not a matter of mere arithmetic, or a school boy could make them. Mathematics may aid, but do not supplant informed judgment." Quoting Rothery, A Study of Forest Taxation in the Pacific Northwest (Industrial Forestry Assoc., Portland, 1952), p 32.

The Commission contends that the taxpayer assumes that the Commission would have used the same "retail value" as a starting point to which the taxpayer's witnesses testified at the trial. The Commission says it would not have applied the above formula, or any other formula, without first working out accurate "retail values" as a starting point. There is no evidence to dispute this statement, but the Commission must have had some method in mind when it ordered the 50 per cent increase. The Commission contends that it took the points covered by the statute into consideration in a general way, even though it did not specify at the trial the particular route taken to reach the result. The record of events shows, however, that the original decision to raise the assessed values in Douglas County was made between March 3 and June 9, 1958, a month before the fact-finding hearings began.

■ If the evidence heard by the trial court is equally subject to more than one interpretation, the Commission, under its presumption of validity, is entitled to prevail.

"The general rule that in the absence of evi-

dence to the contrary, public officers will be presumed to have properly performed their duties and not to have acted illegally, but regularly and in a lawful manner, is usually applied when regulations, decisions, or orders of administrative officers are challenged in court, and the burden of proving otherwise is upon the party complaining.   *   *   *"
42 Am Jur 680, Public Administrative Law § 240, quoted with approval in *State ex rel v. Duncan,* 191 Or 475, 498, 230 P2d 773.

■ We do not believe, however, that the evidence before the trial court was subject to any other interpretation than that which the trial court gave it. The court found that the action of the Commission in ordering a flat increase of 50 per cent on all standing timber in the county was hasty and arbitrary. After the taxpayer appealed to the circuit court, the Commission attempted to show that the result reached by the 50 per cent increase with reference to timber was not grossly out of harmony with other assessed values within Douglas County. The evidence satisfied the trial court to the contrary.

■ It is true that the taxpayer had the burden of proof, and it is true that reasonable men may differ over the methods used by the assessor and those used by the Commission. But there is no escaping the conclusion reached by the trial judge that the Commission saw that time did not permit an application of ORS 306.127 (2) which it was preparing to follow in other counties, so it attempted to achieve approximate tax equality by a short cut.

The Commission had been given until January 1, 1961, to work with the county assessors in bringing about the appraisal of timber as required by ORS 306.127. After January 1, 1961, the Commission is

to have the sole responsibility. There was no need for haste.

In making the 50 per cent increase, the Commission undoubtedly was attempting to bring about approximate equality among several counties, as recited in its order. But in attempting to achieve approximate equality among the several counties, the Commission, so the trial court found, sacrificed equality within Douglas County. See *Appeal of Kliks,* 158 Or 669, 76 P2d 974.

The trial court found from the evidence that the Commission order, as it affected Douglas County, was not based upon a real consideration of the factors enumerated in the statute. ORS 306.127 (2) is mandatory and does not delegate to the Commission any authority to change existing assessments in disregard of its provisions.

The taxpayer does not deny that prior to the enactment of ORS 306.127 the Commission could have ordered a substantial change in the Douglas County assessment of timber, if, in its considered judgment, such a change was necessary and proper. See *State ex rel Galloway v. Watson,* 167 Or 403, 118 P2d 107. The enactment of a specific statute which provides a method for the assessment of timber, however, requires the Commission to do more than to recite in its order that inequalities exist and that "substantial modification in timber values may be necessary."

In 2 Davis, Administrative Law Treatise (West Publishing Co., St. Paul, 1958) 444, § 16.05, we find an instructive discussion of the underlying reason for the requirement that administrative bodies make findings when they act in a decision-making capacity. The requirement that an administrative agency actually go through a discretionary process and that it leave a

record of its method is particularly sound when an agency undertakes to make changes in the method of assessing property.

■ Because the Oregon statutes provide for judicial review of administrative orders of the Commission, it is necessary that the court have before it an understandable statement of the *modus operandi* by which the Commission arrived at the conclusion of its order. In no other manner can judicial review be meaningful and the rights of taxpayers be protected against arbitrariness, no matter how well-intentioned.

As Mr. Justice Cardozo said in a case involving an Interstate Commerce Commission action on a rate reduction, *U. S. v. Chicago M., St. P. & P. R. Co.,* 294 US 499, 510, 55 S Ct 462, 79 L Ed 1023:

> "We would not be understood as saying that there do not lurk in this report phrases or sentences suggestive of a different meaning. One gains at places the impression that the Commission looked upon the proposed reduction as something more than a disruptive tendency; that it found unfairness in the old relation of parity between Brazil and Springfield; and that the new schedule in its judgment would confirm Milwaukee in the enjoyment of an undue proportion of the traffic. The difficulty is that it has not said so with the simplicity and clearness through which a halting impression ripens into reasonable certitude. In the end we are left to spell out, to argue, to choose between conflicting inferences. Something more precise is requisite in the quasi-jurisdictional findings of an administrative agency. *Beaumont, S. L. & W. Ry. Co. v. United States,* 282 U. S. 74, 86; *Florida v. United States,* 282 U. S. 194, 215. We must know what a decision means before the duty becomes ours to say whether it is right or wrong."

■■ Where a statute specifically requires that assessments be made by a method which takes enumerated

factors into consideration, as does ORS 306.127, it is not sufficient for the Commission to recite, as it did in the case of Douglas County, that time did not permit it to comply with the statute. For a reviewing court to say that the order must be sustained merely because the Commission is entitled to a presumption of regularity is to open the door to unlimited administrative discretion which could well be in complete disregard of legislative directives. When irregularity appears on the face of the order, the presumption of regularity is overcome. The court simply has no way of knowing whether due, or any, consideration was given to statutory requirements.

In the text referred to above, Professor Davis uses the following illustration of the need for an administrative record to support a final order:

> "* * * A statute provided that no milk license should be granted unless the commissioner 'is satisfied that the applicant is qualified by character, experience, financial responsibility and equipment to properly conduct the proposed business, that the issuance of the license will not tend to a destructive competition in a market already adequately served, and that issuance of the license is in the public interest.' For the court to review a bulky record without knowing which of the six factors the commissioner found to be lacking would obviously be wasteful * * *." Davis, Administrative Law Treatise, supra, at 444.

And the facilitation of judicial review is only one of the underlying reasons why administrative agencies must show the route taken to reach a decision as well as the ultimate conclusion. An even stronger reason is one expressed by Mr. Justice Douglas in a dissenting memorandum:

> "Unless we make the requirements for adminis-

trative action strict and demanding, *expertise,* the strength of modern government, can become a monster which rules with no practical limits on its discretion. Absolute discretion, like corruption, marks the beginnings of the end of liberty  *  *  *." *New York v. United States,* 342 US 882, 884, 72 S Ct 152, 153, 96 LEd 662.

■■ Still a further reason for the requirement that the Commission, or any other administrative agency, state its reasons for reaching a decision which will be subject to judicial review is to prevent a judicial usurpation of the administrative authority. It is settled law that the administrative decisions of boards and commissions acting within their authority are entitled to persuasive force upon judicial review. See, for example, the cases cited in *Jehovah's Witnesses v. Mullen et al,* 214 Or 281, 330 P2d 5, appeal dismissed 359 US 436, 79 S Ct 940, 3 L Ed2d 932. But an incomplete statement of the method used to reach a vital administrative decision which affects the substantial property rights of citizens is an open invitation to a judicial effort to arrive at a different result. This court does not intend to substitute its judgment for that of the Commission. The order will not be revised in court; it is either valid or it is void. The trial court having found that the Commission order was arbitrary, the order was held to be void. We concur. In holding that the order was arbitrary, neither the trial court nor this court holds that the Commission acted in bad faith, or otherwise than with the best of intentions. However, an administrative decision which shows on the face of the order that it was made without due regard for the factors which were required to have been taken into account is just as void as an order made and entered by reason of improper motives.

For the above reasons we concur in the findings of the trial court.

Before taking testimony, the trial court ruled against the Commission on a jurisdictional question which received much attention in the briefs and upon argument, but with which we will deal briefly in order not to prolong this opinion.

On September 12, 1958, the Commission issued the original order which is the subject of this review. It will be noted in *Weyerhaeuser Timber Co. v. State Tax Commission*, 223 Or 280, 355 P2d 615, also decided today, that the order there appealed from was designated as VL 58-206-A, dated September 24, 1958. Between these two dates, the taxpayer in Douglas County commenced its attack on Order No. VL 58-206 without waiting for formal service of the order upon it. Thereafter, the Commission served Order No. VL 58-206-A, which in all material respects was identical to the order appealed from. The purpose of the revised order was to vacate the previous order and make minor changes, not here material, in the four counties in which the original order was to have been operative.

The trial court, over the continuing objection of the Commission, held that, because the proceedings for judicial review had been commenced prior to the publication of the revised order, the court had jurisdiction to hear and determine the matter, even though the taxpayer had not been served. The taxpayer had submitted to the jurisdiction of the court without being served, and the court proceeded as if the taxpayer had been a litigant in an ordinary court action who appeared in court without being served. There was no error in so proceeding.

The decree is affirmed, plaintiff to recover costs.