## BENEVOLENT PROTECTIVE ORDER OF ELKS, LODGE NO. 1680 *v.* DEPARTMENT OF REVENUE

Wendell Gronso, Burns, represented plaintiff.

Irvin D. Smith, Burns, represented defendant.

Decision for defendant rendered July 27, 1976.

CARLISLE B. ROBERTS, Judge.

Plaintiff appeals from defendant's Order No. VL 75-455, issued on August 13, 1975. The issue is the true cash value of plaintiff's lodge building for the tax year 1973-1974. The assessor has valued the land at $36,000 and the improvements at $188,180 (according to defendant's order; $188,810, according to the pleadings). While agreeing with the land value, the plaintiff contends that the value of the improvements should not exceed $114,000.

Plaintiff's Elks Lodge, located in Burns, Oregon, was built in 1962-1963. Its 9,700 square feet include a dance floor, bar, kitchen, dining area, and various other lounges and rooms. (The value of a large, as-

phalt-surfaced parking lot is apparently not in dispute.) The court is charged with determining the value of the building improvements on the property as of January 1, 1973, the date of assessment, as shown by a preponderance of the evidence. ORS 305.427. At trial, plaintiff and defendant relied primarily on the cost approach to value, although plaintiff made some references to the market data approach and the income approach, chiefly to demonstrate the paucity of data.

Plaintiff's expert witness was Jett C. Blackburn, a real estate broker in Harney County for approximately 15 years. He was well acquainted with Harney County property values and with the techniques of real estate appraisal. He estimated that the building, containing 9,700 square feet of floor space, should be valued at $20 per square foot. He arrived at this value based on his knowledge of building costs and through consultation with the original contractors who built the lodge. He thus arrived at a value of $194,480, to which he applied depreciation at 41 percent, based on his estimate of physical depreciation at 11 percent and of functional depreciation at 30 percent. He testified that this latter figure was a conclusion reached in consideration of the fact that there was no known market for an Elks Lodge in Burns and that it would require substantial sums to convert the property for use as an office building. His total estimate of value of the improvements was $114,744.

The defendant offered William Z. Thomson, an appraiser with the Harney County Assessor's office for four years, as an expert witness. Using the Marshall-Stevens Valuation Service (also referred to by the witness as the Marshall-Swift Service), he arrived at a value of just over $22 per square foot, which worked out to a total estimate of value of

$217,500. The Marshall-Stevens Valuation Service provides basic construction costs that must be adjusted for each geographic area. Mr. Thomson used the closest area to Burns that was included in the service, Bend, Oregon. In addition to the constructed building, measured by cost per square foot, he added $17,700 for fixtures that are assessable as realty. (These items apparently were not considered by Mr. Blackburn.) He allowed a 20 percent deduction for depreciation, which included 15 percent for physical depreciation plus 5 percent functional depreciation. His total estimate of value of improvements was $188,180.

A second witness for the defendant, Loris A. Smyth, had been supervisor of Mr. Thomson in the county assessor's office when Mr. Thomson made the appraisal of the subject property. Mr. Smyth testified that he had approved Mr. Thomson's choices of categories (necessarily made in using the Marshall-Stevens Valuation Service) and checked his arithmetic. Both parties agreed that Mr. Thomson's physical measurements of the property were accurate.

The court must decide which of the appraisers has made a more convincing estimate of value. Mr. Blackburn's testimony was wholly oral, without any supporting exhibits, but he appeared knowledgeable. Mr. Thomson presented an exhibit; *i.e.,* his written material constituting the assessor's official record, but his work was largely mechanical. Regarding the question of whether $20 per square foot or $22 per square foot should be used, the court believes that Mr. Blackburn has made a more persuasive presentation. He consulted with the people who had actually constructed the improvement and he had some knowledge of building costs from constructing his own building. Defendant's appraiser relied heavily on the valuation service and admitted little knowledge of building costs in the area.

The use by the county assessor of a valuation service, approved by the Department of Revenue, in estimating values, is the use of a tool that the court approves; however, as with any other appraisal aid, it requires a thorough understanding of its purposes and limitations. In this instance, it demands close acquaintance with local construction costs as a basis for essential adjustments. No such knowledge was displayed by defendant's first witness. For example, the witness asserted that construction costs in Burns were higher than those of Bend, the cost center he utilized in the Marshall-Stevens Valuation Service, but he was unable to substantiate this with any specific knowledge of the cost of various types of material or labor. In addition, testimony indicated that significant portions of the subject structure were built with local materials, presumably still available, that would not be accompanied by expensive shipping costs, but this was unknown to the witness.

The court thus finds that the $194,480 estimate of value developed by Mr. Blackburn is the more persuasive. However, he failed to include in his estimate of value the $17,700 of fixtures assessed as realty. Thus, the total value of improvements would be increased to a rounded $212,000.

Depreciation is the next area of conflict. Mr. Blackburn estimated physical depreciation to be 11 percent while Mr. Thomson estimated 15 percent. For the same reasons the court has expressed earlier, the court finds the 11 percent physical depreciation to be the more acceptable figure.

The final area of difference is in the amount of functional depreciation (always a difficult figure to determine authoritatively). Mr. Blackburn estimated 30 percent, which gave consideration to the cost of remodeling the building so that it could be used as

offices, while Mr. Thomson estimated only 5 percent. The court finds depreciation at 5 percent to be more acceptable.

■ Plaintiff's position is that, since there is no market for an Elks Lodge in Burns, the building should be valued as an office building. The court cannot accept this position. A specialized building with an ongoing use, which is the highest and best use, should be valued at that use. The failure to prove an *immediate* market value does not prevent it from being assessed at its replacement cost, less physical depreciation. ORS 308.205.

In *People ex rel. New York Stock Exchange Bldg. Co. v. Cantor,* 221 App Div 193 (223 NYS 64), *aff'd,* 248 NY 533, 162 NE 514 (1928), the taxpayer contended that its Wall Street building housing a stock exchange had no value for property tax purposes. It argued that the building should be valued "as a teardown proposition"; that the building was actually "an encumbrance which diminishes the value of the land." The court rejected this notion, saying that "simply because the property cannot be sold under ordinary circumstances" or because it had no "market value," this does not mean it did not have a value for ad valorem tax purposes. The court held that the building should be assessed at its reproduction cost, less depreciation.

The court in *Appeal of Kliks,* 158 Or 669, 691-692, 76 P2d 974, 983 (1938), cited with approval the *New York Stock Exchange Bldg. Co.* case, *supra.* It said that "[t]ear-down values are not controlling if the improvement is useful to its owner or is likely to find a buyer when placed upon the market. * * *"

In I Bonbright, *Valuation of Property* 66 (1937), the distinguished author takes note of the problem:

"This very characteristic of market value means

that the concept has but a limited usefulness in the valuation of property. For if it were invariably accepted as the basis of an appraisal, it would require a finding that many properties, highly prized for the special purposes for which they are designed, are of trivial value because only the present owner is in a position to exploit them. Many of the so-called 'service properties,' such as churches, schoolhouses, college campuses, and expensive mansions would fall into this category, * * *." (Footnote omitted.)*

The closest parallel legal concept is found in the area of condemnation where the courts attempt to make the owner whole. I Bonbright, *supra,* at 73. The legislature recognized this concept in drafting ORS 308.205:

"True cash value of all property, real and personal, means market value as of the assessment date. True cash value in all cases shall be determined by methods and procedures in accordance with rules and regulations promulgated by the Department of Revenue. *With respect to property which has no immediate market value, its true cash value shall be the amount of money that would justly compensate the owner for loss of the property.*" (Emphasis supplied.)

 The fact that property in its ongoing use does not have a market value does not mean that it should be valued, as plaintiff herein desires, as an office building. In such a case, the assessor must value at what it would cost to justly compensate the owner for the loss of its property. This court is confident

---

* This may explain why churches, schoolhouses, college campuses and, now, Elks Lodges are generally exempt from ad valorem taxation! It also explains the last sentence of ORS 308.205, quoted in the text.

that plaintiff herein would not agree to a 30 percent functional obsolescence charge on the basic value of its property if it were condemned and it sought just compensation. In such a case, the loss would be the loss of an Elks Lodge, not a building that, with considerable expense, could be converted to an office structure. The court finds the functional depreciation to be 5 percent.

Applying the total depreciation of 16 percent, 11 percent physical depreciation and 5 percent functional depreciation, to the $212,000 figure previously determined, the indicated value of all the improvements, rounded, would be $178,000.

Plaintiff also suggested a market approach and an income approach to value. The first market sale was that of the Antler Club in Hines, Oregon. It was half the square feet of the subject property that sold over two years after the valuation date. The sale was complicated by the fact that it was a going commercial business and the sales price included a liquor license. The court feels greater confidence in the cost approach as previously set forth.

The second sale and plaintiff's income approach involved office buildings. As has been previously determined, the subject property should be valued as the lodge of a fraternal organization and it would be incorrect to compare it with office buildings. The court therefore finds no utility in the market and income approaches presented by plaintiff in this case.

The court finds the value of the improvements on the subject property as of January 1, 1973, to be $178,000. Order No. VL 75-455 is hereby set aside and held for naught.

The county's assessor and tax collector shall amend the assessment and tax rolls of Harney County for 1973-1974 in accordance with this decision. If the re-

sulting tax has been overpaid, refund with interest shall be made by the county commissioners to the plaintiff pursuant to ORS 311.806 and ORS 311.812.

No costs to either party.